# SECURITIES AND EXCHANGE COMMISSION v. AMERICAN TRAILER RENTALS CO.

No. 35.   Argued November 10, 1964.—
Decided January 18, 1965.

*Daniel M. Friedman* argued the cause for petitioner. With him on the briefs were *Solicitor General Cox; Philip A. Loomis, Jr.,* and *David Ferber.*

*Arthur W. Burke, Jr.,* argued the cause and filed a brief for respondent.

*Marcien Jenckes* argued the cause and filed a brief for the State Mutual Life Assurance Company of America et al., as *amici curiae.*

MR. JUSTICE GOLDBERG delivered the opinion of the Court.

The issue in this case is whether respondent's attempted corporate rehabilitation under the Bankruptcy Act, materially affecting the rights of widespread public investor creditors, may be conducted under Chapter XI of the Bankruptcy Act, 52 Stat. 905, as amended, 11 U. S. C. § 701 *et seq.* (1958 ed.), or whether dismissal or, in effect, transfer to proceedings under Chapter X of that Act, 52 Stat. 883, as amended, 11 U. S. C. § 501 *et seq.* (1958 ed.), is required upon motion by the Securities and Exchange Commission or any other party in interest, pursuant to § 328 of the Bankruptcy Act, 66 Stat. 432, 11 U. S. C. § 728 (1958 ed.).[1]

---

[1] "The judge may, upon application of the Securities and Exchange Commission or any party in interest, and upon such notice to the debtor, to the Securities and Exchange Commission, and to such other persons as the judge may direct, if he finds that the proceedings should have been brought under chapter 10 of this title, enter an order dismissing the proceedings under this chapter, unless, within such time as the judge shall fix, the petition be amended to comply with the requirement of chapter 10 of this title for the filing of a debtor's petition or a creditors' petition under such chapter, be filed. Upon the filing of such amended petition, or of such creditors' petition, and the payment of such additional fees as may be required to comply with section 532 of this title, such amended petition or creditors' petition shall thereafter, for all purposes of chapter 10 of this title, be deemed to have been originally filed under such chapter."

## I.

Respondent, American Trailer Rentals Company, was organized in 1958 to engage in the automobile-trailer rental business.[2] The business was financed largely through the sale of trailers to investors and their simultaneous lease-back. From 1959 to 1961 hundreds of small investors, scattered throughout the entire western part of the United States, purchased and leased back a total of 5,866 trailers, paying an aggregate price of $3,587,439 (approximately $600 per trailer). Under the usual form of lease-back agreement, the trailer owners were to receive a set 2% of their investment per month for 10 years.[3]

The trailers sold to investors and then leased back are of the general utility type that are attached to the rear bumper of automobiles. They were placed by respondent at gasoline stations, the operators of which acted as respondent's rental agents, without the investors ever having seen them. Respondent had about 700 such service station operators in December 1961, although the number had declined to about 500 by the time the petition for an arrangement was filed a year later.

Respondent's further offering of these sale and lease-back arrangements to the public was halted in 1961, when the SEC advised respondent that these sale and lease-back arrangements were investment contracts and therefore securities, which could not be sold to the public unless and until a registration statement was filed and became

---

[2] Respondent was originally one of a group of interrelated companies that later merged into it; for simplicity we have considered it as one company throughout its history.

[3] Although the overwhelming majority of the agreements are of this type, they vary from 2% to 3% per month and from 5 to 10 years. A few provide for a flat 35% of the rental derived from the trailers involved.

effective under the Securities Act of 1933, 48 Stat. 74, as amended, 15 U. S. C. § 77a *et seq.* (1958 ed.). Respondent then filed a registration statement with the SEC pertaining to these sale and lease-back arrangements. This registration statement, however, never became effective, and proceedings were instituted by the SEC to stop distribution of respondent's proposed prospectus on the grounds that it contained false and misleading statements. See Securities Act of 1933, § 8 (d), 48 Stat. 79, 15 U. S. C. § 77h (d) (1958 ed.). In June 1963, respondent consented to the entry of an order stopping distribution of this prospectus. See SEC, Securities Act Release No. 4615 (1963).

After this attempt to register the sale and lease-back agreements had failed, respondent's executive vice president and other persons organized a corporation named Capitol Leasing Corporation, which offered respondent's investor creditors an exchange of its stock for their trailers on the basis of one share of its stock for each $2 the investor creditors had paid for the trailers. After Capitol had acquired approximately 300 of the 5,866 trailers outstanding in exchange for its stock, the SEC suspended the exemption from registration for small offerings, upon which Capitol had relied in making this offer,[4] on the grounds that there was reasonable cause to believe that the material used in making this offer again contained false and misleading statements.

Following this event, respondent filed a petition and a proposed plan of arrangement under Chapter XI of the Bankruptcy Act. The petition, annexed schedules, and other documents show that respondent had never operated at a profit. For the three years ended September

---

[4] See Regulation A (17 CFR § 230.251 *et seq.*), promulgated pursuant to the Securities Act of 1933, § 3 (a), 48 Stat. 75, 15 U. S. C. § 77c (a) (1958 ed.).

30, 1961, it had an aggregate income from "gross rentals" of $395,610. In the same period, it made rental payments to investor-trailer owners of $613,021; made payments to gasoline station operators of $118,400; and incurred additional "operating expenses" of $668,698.

The $613,021 paid to trailer owners included payments to investors whose trailers had not yet been obtained and put into the system. In order to make the necessary payments to trailer owners and station operators respondent had not only borrowed money from its officers, directors, and stockholders but also had used funds obtained for purchase of new trailers. Virtually all the trailers were purchased from an affiliate in which respondent's officers and directors had interests. Many of these trailers proved defective in design or otherwise unsuitable for rental. About a year prior to the filing of respondent's Chapter XI proceeding, this manufacturing affiliate became bankrupt, owing respondent approximately $200,000 for trailers that were never manufactured and an additional amount of approximately $150,000 for trailers that were manufactured but never delivered. These latter trailers had been mortgaged by the affiliate to a third party who took possession upon the affiliate's bankruptcy. In addition, in June 1961, some 100 trailers, as to which respondent, although obligated by the lease-back arrangements to do so, did not have insurance coverage, were unlocatable and considered lost. Finally, certain funds received from investors for the purchase of trailers had been, at an earlier period, misappropriated by a member or members of respondent's management. Respondent's executive vice president, who estimated this misappropriation loss to be at least $141,000, attributed it "almost completely" to a deceased member of the original management group, but did not feel "qualified to make [the] judgment" that the two remaining mem-

bers of that group, including one who owned over 15% of respondent's common stock, could be held liable.

At the time of filing its Chapter XI petition, respondent stated its total assets as $685,608, of which $500,000 represented the stated estimated "value" of its trailer-rental system, an intangible asset. It stated in its petition that its trailer-rental system (which then consisted of arrangements with some 500 service station operator agents) "was built by [respondent] at an estimated cost of $500,000," despite the fact that respondent's balance sheet in 1961 showed the cost of establishing a system of 700 stations as only $33,750, and that in 1961 respondent had estimated that the cost of establishing an additional 800 rental stations would be only $56,000. The total liabilities were stated at $1,367,890, of which $710,597 was owed to trailer owners under their leasing agreements; $200,677 was owed to the investors who had paid for trailers that had never been manufactured; $71,805 was owed to trade and other general creditors; and $285,277 was owed to respondent's officers and directors.

Under the proposed plan of arrangement submitted by respondent the investor-trailer owners were to exchange their entire interests (their rights in the trailers as well as the amounts owed them under the rental agreements) for stock of Capitol on the basis of one share of stock for each $2 of "remaining capital investment in the trailers," which sum was to be determined by deducting from the original purchase price of the trailers the amount, if any, which the owners had received as rental payments.[5] Respondent's officers and directors, as well as trade and other general creditors, were to receive one share of stock

---

[5] This is, of course, less than the exchange that Capitol had offered some months earlier under the exemption from registration which had been suspended, since there trailer owners had been offered one share of stock for each $2 that they had paid with no deductions for so-called "return of capital." See *supra,* p. 599.

for each $3.50 of their claims. Respondent, itself, in exchange for transferring to Capitol its trailer-rental system, was to receive 107,000 shares which it would then distribute to its stockholders. Finally, obligations to two banks, totaling $55,558, although clearly unsecured, were to be paid in full, presumably because the officers and directors of respondent would otherwise have been liable as guarantors of these obligations.

If this plan were approved and all of the investor-trailer owners participated, a total of approximately 866,000 shares of Capitol's stock would be issued to them, but approximately 81,500 shares would be issued directly to the officers and directors of respondent, 22,400 to trade and other general creditors, and 107,000 to respondent itself to be distributed to its stockholders. More than 60% of respondent's stock was held by eight men, seven of whom are officers and directors and the eighth one of the original promoters of the venture.

The SEC then filed a motion, under § 328 of the Bankruptcy Act, to dismiss the Chapter XI proceeding or, in effect, transfer it to Chapter X on the ground that it should have been brought under Chapter X of the Bankruptcy Act and thus Chapter XI is not available. A referee in bankruptcy to whom, as a special master, the motion was referred, recommended that it be denied on the grounds that the Commission had not made "a sufficient showing to warrant the granting of the Section 328 motion." At his hearing on this matter, the District Judge recognized that, in light of the fact that the investor-trailer owners were widely scattered and the nature of their individual holdings was small, the proposed plan's issuance of approximately 15% of Capitol's stock to respondent's officers and directors would mean that they, rather than the investor-trailer owners, would have effective control over Capitol, and expressed his "disapproval" of such a result. He also expressed dis-

approval of preferential treatment of the banks in order to avoid the obligations of the officer and director guarantors.[6] The District Court, however, "accepted and adopted" the referee's findings and denied the motion without a written opinion. The Court of Appeals affirmed, holding that, "since the granting of the motion rests in the discretion of the [district] court, while we think this is a border-line case, it does not appear that the S. E. C. has shown that adequate relief is not obtainable in Chapter XI proceedings or that there has been an abuse of that discretion warranting reversal." 325 F. 2d 47, 52. We granted certiorari, 376 U. S. 948.

## II.

The background and operative procedures of Chapter X and Chapter XI and the interrelationship between them have been reviewed by this Court in *SEC* v. *United States Realty & Improvement Co.,* 310 U. S. 434, and *General Stores Corp.* v. *Shlensky,* 350 U. S. 462. This background was detailed in *United States Realty, supra,* as follows:

Before passage, in 1934, of § 77B of the Bankruptcy Act, 48 Stat. 912, bankruptcy procedures offered no facilities for corporate rehabilitation, which, therefore, was left to equity receiverships, with their attendant paraphernalia of creditors' and security holders' committees, and of rival plans of reorganization. Lack of judicial control of the conditions attending formulation of the plans, inadequate protection of widely scattered security holders, frequent adoption of plans which favored

---

[6] Following this hearing, the plan was then modified to provide that respondent's officers and directors would receive one share of Capitol stock for each $5.50, instead of each $3.50, of their claims, with this stock having limited voting, dividend and liquidation rights for five years, and that the banks would be treated in the same manner as respondent's other general creditors.

management at the expense of other interests and which afforded the corporation only temporary respite from financial collapse, so often characteristic of equity receivership reorganizations, led to the enactment of § 77B. See S. Doc. No. 65, 72d Cong., 1st Sess., 90; H. R. Rep. No. 1409, 75th Cong., 1st Sess., 2. As does the present Chapter X, § 77B permitted the adjustment of all interests in the debtor, secured creditors, unsecured creditors, and stockholders.

The day preceding the enactment of § 77B, Congress had created the Securities and Exchange Commission as a special agency charged with the function of protecting the investing public, 48 Stat. 885, as amended, 15 U. S. C. § 78d (1958 ed.). At the urging of, and based on extensive studies by the SEC, § 77B was, in 1938, revised and enacted in changed form as Chapter X. 52 Stat. 883–905. The aims of Chapter X as thus revised were to afford greater protection to creditors and stockholders by providing greater judicial control over the entire proceedings and impartial and expert administrative assistance in corporate reorganizations through appointment of a disinterested trustee and the active participation of the SEC. The trustee in a Chapter X proceeding [7] is required to make a thorough examination and study of the debtor's financial problems and management, Bankruptcy Act, §§ 167 (3), (5), and then transmit his independent report to the creditors, stockholders, the SEC, and others. Following this, the trustee gives notice to all creditors and stockholders to submit to him proposals for a plan of reorganization. §§ 167 (5), (6). The trustee then formulates a plan of reorganization which he presents to the court. If the court finds the plan worthy of considera-

---

[7] Where the debtor's liabilities are less than the minimal sum of $250,000, a situation clearly not present here, Chapter X permits, but does not require, the court to appoint a trustee.

tion, it may refer it to the SEC for its opinion and must so refer it where the debtor's liabilities exceed $3,000,000. § 172. When the proposed plan, after approval by the court, is finally submitted to the debtor's creditors and stockholders, it is accompanied by the advisory report of the SEC, as well as the opinion of the judge who approved the plan. § 175. As to each class of creditors and stockholders whose rights are affected by the plan, the plan must receive the approval of the holders of two-thirds in amount of each class of creditors' claims and, if the debtor has not been found to be insolvent, the holders of a majority of each class of stock. § 179. The plan becomes effective upon final confirmation by the court, based on a finding, *inter alia,* that "the plan is fair and equitable." § 221.

As part of the same Act in which Chapter X was enacted Congress also, in 1938, enacted Chapter XI. 52 Stat. 905–916. Chapter XI is a statutory variation of the common-law composition of creditors and, unlike the broader scope of Chapter X, is limited to an adjustment of unsecured debts. It was sponsored by the National Association of Credit Men and other groups of creditors' representatives whose experience had been in representing trade creditors in small and middle-sized commercial failures. See Hearings before the House Committee on the Judiciary on H. R. 6439 (reintroduced as H. R. 8046 and enacted in 1938), 75th Cong., 1st Sess., 31, 35; 13 J. N. A. Ref. Bankr. 17 (1938). The contrast between the provisions of Chapter X, carefully designed to protect the creditor and stockholder interests involved, and the summary provisions of Chapter XI is quite marked. The formulation of the plan of arrangement, and indeed the entire Chapter XI proceeding, for all practical purposes is in the hands of the debtor, subject only to the requisite consent of a majority in number and amount of unse-

cured creditors, § 362, and the ultimate finding by the court that the plan is, *inter alia*, "for the best interests of the creditors," § 366.[8] "The process of formulating an arrangement and the solicitation of consent of creditors, sacrifices to speed and economy every safeguard, in the interest of thoroughness and distinterestedness, provided in Chapter X." *United States Realty, supra*, at 450–451. The debtor generally remains in possession and operates the business under court supervision, § 342. A trustee is only provided in the very limited situation where a trustee in bankruptcy has previously been appointed,[9] § 332. There is no requirement for a receiver, but the Court "may" appoint one if it finds it to be "necessary," § 332. The plan of arrangement is proposed by, and only by, the debtor, §§ 306 (1), 323, 357, and creditors have only the choice of accepting or rejecting it. Acceptances may be solicited by the debtor even before filing of the Chapter XI petition and, in fact, must be solicited before court review of the plan, § 336 (4). There are no provisions for an independent study by the court or a trustee, or for advice by them being given to creditors in advance of the acceptance of the arrangement. In short, Chapter XI provides a summary procedure whereby judicial confirmation is obtained on a plan that has been formulated and accepted with only a bare minimum of independent control or supervision. This, of course, is consistent with the basic purpose of Chapter XI: to provide a quick and economical means of facilitating simple compositions among general creditors who have been

---

[8] Originally Chapter XI, as well as Chapter X, required that the plan be "fair and equitable." That requirement of Chapter XI was changed to the one stated in the text in 1952. See *infra*, p. 611.

[9] This could only occur when the Chapter XI proceeding had been filed by a debtor already in straight bankruptcy proceedings. See § 321; 8 Collier, Bankruptcy, 587–588 (1964 ed.).

deemed by Congress to need only the minimal disinterested protection provided by that Chapter.

In enacting these two distinct methods of corporate rehabilitations, Congress has made it quite clear that Chapters X and XI are not alternate routes, the choice of which is in the hands of the debtor. Rather, they are legally, mutually exclusive paths to attempted financial rehabilitation. A Chapter X petition may not be filed unless "adequate relief" is not obtainable under Chapter XI, § 146 (2). Likewise, a Chapter XI petition is to be dismissed, or in effect transferred, if the proceedings "should have been brought" under Chapter X, § 328.

## III.

The SEC here contends that, as an absolute rule, all proceedings for the financial rehabilitation of a corporate debtor which would alter the rights of public investor creditors must be in Chapter X. Respondent, on the other hand, contends that there is no such absolute rule and that the determination of whether proceedings, on the facts of a particular case, should be in Chapter X or in Chapter XI rests in the discretion of the District Court, which discretion should not be reversed unless it is found to have been clearly abused. Both parties rely on *United States Realty, supra,* and *General Stores Corp., supra,* for their respective contentions.

*United States Realty* involved a corporation with publicly owned debentures, publicly owned mortgage certificates, and publicly owned stock, which proposed a plan of arrangement that would have left the debentures and stock unaffected but would have both extended the time for payment of the publicly held mortgage certificates and reduced their interest rate. The SEC there argued that Chapter X is the exclusive avenue for financial rehabilitation of large corporations with many stock-

holders. While rejecting this argument as an absolute matter, the Court recognized that "in general . . . the two chapters were specifically devised to afford different procedures, the one [Chapter X] adapted to the reorganization of corporations with complicated debt structures and many stockholders, the other [Chapter XI] to composition of debts of small individual business and corporations with few stockholders . . . ." 310 U. S., at 447. The Court then held that, as the proposed plan of arrangement adversely affected the rights of many, widely scattered public creditors, to wit, the holders of mortgage certificates, the formulation of a plan with the judicial control, statutory SEC participation, and employment of disinterested trustees, assured by Chapter X, would better serve "the public and private interests concerned including those of the debtor," *id.*, at 455, than would the formulation of a Chapter XI plan under the almost complete control of the debtor. In reaching this result, the Court explored at great length the safeguards of Chapter X and their protection of public investors:

> "The basic assumption of Chapter X and other acts administered by the Commission is that the investing public dissociated from control or active participation in the management, needs impartial and expert administrative assistance in the ascertainment of facts, in the detection of fraud, and in the understanding of complex financial problems." *Id.*, at 448–449, n. 6.

Applying these principles, the Court therefore reversed the Court of Appeals' affirmance of the District Court's refusal to dismiss a Chapter XI proceeding which the SEC had challenged on the grounds that it should have been brought under Chapter X.

It should be noted that, prior to *United States Realty*, a bill had been introduced in Congress to draw a numeri-

cal line that would close Chapter XI to any corporation which had any class of its securities owned by 100 or more creditors or stockholders. See Hearing before Special Subcommittee on Bankruptcy and Reorganization of the House Committee on the Judiciary on H. R. 9864, 76th Cong., 3d Sess. In reporting out the bill, the Subcommittee stated:

"Sections 4, 5, 6, and 7 of the bill, which are eliminated by the last of your committee's amendments, provided for amendments to chapter XI of the Bankruptcy Act which were designed to prevent corporations which are publicly indebted or owned from filing a petition for an arrangement under chapter XI, rather than a petition for reorganization under chapter X, the chapter specially designed for the reorganization of such corporations, and to establish a numerical test of such 'public' indebtedness or ownership.

"Your committee believes that, while the amendments proposed by sections 4, 5, 6, and 7 are desirable, the element of emergency requiring their immediate passage has been eliminated by the decision of the United States Supreme Court in *Securities and Exchange Commission* v. *U. S. Realty and Improvement Company*. That decision was rendered on May 27, 1940, after the introduction of the bill. Since immediate action on these proposals does not appear to be necessary, the last of your committee's amendments provides for the striking out of sections 4, 5, 6, and 7. The committee's conclusion is supported by all of the witnesses who testified at the hearings before the committee's Subcommittee on Bankruptcy and Reorganization and also by the report of the Securities and Exchange Commission on the bill." H. R. Rep. No. 2372, 76th Cong., 3d Sess., 2.

In *General Stores Corp.* v. *Shlensky, supra,* a corporation with over 2,000,000 shares of common stock, held by over 7,000 shareholders, but with no publicly held debt of any kind, petitioned under Chapter XI for an arrangement of its unsecured debt, consisting of obligations to trade creditors and one private investor. The District Court had held, with the Court of Appeals affirming, that Chapter XI was unavailable as the debtor needed more extensive reorganization than merely a simple arrangement with unsecured creditors. This Court affirmed. In so doing, the Court again rejected the SEC's argument that, as an absolute matter, Chapter XI is not available where the debtor is publicly owned.

The Court stated:

> "It may well be that in most cases where the debtor's securities are publicly held c. X will afford the more appropriate remedy. But that is not necessarily so. A large company with publicly held securities may have as much need for a simple composition of unsecured debts as a smaller company. And there is no reason we can see why c. XI may not serve that end. The essential difference is not between the small company and the large company but between the needs to be served." 350 U. S., at 466.

The Court pointed out that the "needs to be served" included such factors as requirements of fairness to public debt holders, need for a trustee's evaluation of an accounting from management or determination that new management is necessary, and the need to readjust a complicated debt structure requiring more than a simple composition of unsecured debt. *Id.,* at 466–467.

## IV.

We agree with the parties that the principles of *United States Realty* and *General Stores* apply to and govern the result in this case. We reaffirm the holdings of these

cases that there is no absolute rule that Chapter X must be utilized in every case in which the corporate debtor is publicly owned. As this Court has recognized, Congress has drawn no such hard-and-fast line between the two Chapters. The SEC, purporting to bow to these holdings, urges in this case, however, a variation of its absolute-rule argument that, while not requiring Chapter X in all cases in which the debtor is publicly owned, would require the use of Chapter X in 100% of the cases involving the rights of public investor creditors.

It argues, in support of this variation of its absolute rule, that to hold otherwise would deprive the investor creditors of Chapter X's protection of the "fair and equitable" requirement of a plan. As noted above, whereas Chapter X contains the proviso that a plan must be "fair and equitable," Chapter XI only requires that it be "for the best interests of the creditors." The words "fair and equitable" are "words of art" which mean that senior interests are entitled to full priority over junior ones and, in particular, "that in any plan of corporate reorganization unsecured creditors are entitled to priority over stockholders to the full extent of their debts and that any scaling down of the claims of creditors without some fair compensating advantage to them which is prior to the rights of stockholders is inadmissible." *United States Realty, supra,* at 452. The SEC's argument, however, is premised on the assertion, for which we can find no support in either the language or legislative history of Chapters X and XI, that Congress has deemed it necessary in all cases involving public investor creditors that they have the protection of the "fair and equitable" doctrine. In fact, the requirement that a plan be "fair and equitable" was part of Chapter XI, as well as Chapter X, until 1952, when Congress deleted it from Chapter XI and replaced it with the requirement that the plan be "for the best interests of the creditors." Congress clearly deemed this

latter requirement to be sufficient protection in a proceeding properly in Chapter XI in light of the general philosophy of Chapter XI to expedite "simple" compositions. See S. Rep. No. 1395, 82d Cong., 2d Sess., 10, 11–12; H. R. Rep. No. 2320, 82d Cong., 2d Sess., 19, 20–21. There is no indication that in so doing, Congress intended in any way to change the law on the interrelationship between Chapters X and XI. In fact, the history is just the opposite.[10] In the same Act that deleted the "fair and equitable" requirement from Chapter XI, Congress expressly codified, in § 328, the rule of *United States Realty* providing for dismissal, or, in effect transfer, of a Chapter XI proceeding if it "should have been brought" in Chapter X. Nothing in this even suggests transfer as an absolute rule to give Chapter X's "fair and equitable" protection to all cases involving public investors, which presumably if Congress had so intended, it would have so stated. Moreover, as noted above, *supra,* pp. 608–609, a House subcommittee previously approved the *United States Realty* holding of a general, but not absolute, rule, and had not reported out a bill that would have drawn an absolute line.[11]

The SEC further argues that Chapter X is required in all cases involving public investor creditors, because its right to intervene in a Chapter XI proceeding is limited solely to moving under § 328 for a transfer to Chapter X.

---

[10] This, of course, also answers respondent's argument that Congress, by deleting the "fair and equitable" requirement from Chapter XI, has somehow overturned the holding and principles of *United States Realty.* See also *infra,* p. 614.

[11] This, of course, does not mean that Chapter X's greater protection for public investor creditors in this regard, as well as protections of greater judicial control, a disinterested trustee, and full statutory SEC participation, is irrelevant in determining whether, as a general rule, Chapter X or Chapter XI would better serve the "public and private interests involved," cf. *General Stores, supra,* at 466. See *infra,* p. 614.

We reject this argument. The District Court, in this case, quite properly recognized that the SEC was not so limited in a Chapter XI proceeding, and we hold that, under the statutory scheme, while not charged with express statutory rights and responsibilities as in Chapter X, the SEC is entitled to intervene and be heard in a Chapter XI proceeding. We therefore reject the SEC's variation of its absolute-rule argument, advanced in this case, that would require the use of Chapter X in all cases in which the rights of public investor creditors are involved. The short answer is that, as with the SEC's original absolute-rule argument, Congress has drawn no such absolute line of demarcation between Chapters X and XI.

This does not mean, however, that we disagree with the holding of *United States Realty* that, although there is no absolute rule requiring that Chapter X be utilized in every case in which the debtor is publicly owned, or even where publicly held debt is adjusted, as a general rule Chapter X is the appropriate proceeding for adjustment of publicly held debt. See *SEC* v. *Canandaigua Enterprises Corp.*, 339 F. 2d 14 (C. A. 2d Cir.). Not only do we not disagree with this holding, but we expressly reaffirm it.[12] Public investors are, as here, generally widely scattered and are far less likely than trade creditors to be aware of the financial condition and cause

---

[12] While sometimes expressing different rationales for their conclusions it is clear that the courts of appeals have recognized the general rule stated above. See *SEC* v. *Canandaigua Enterprises Corp.*, *supra; SEC* v. *Crumpton Builders, Inc.*, 337 F. 2d 907 (C. A. 5th Cir.); *SEC* v. *Liberty Baking Corp.*, 240 F. 2d 511 (C. A. 2d Cir.); *Mecca Temple* v. *Darrock*, 142 F. 2d 869 (C. A. 2d Cir.); cf. *Grayson-Robinson Stores, Inc.* v. *SEC*, 320 F. 2d 940 (C. A. 2d Cir.); *SEC* v. *Wilcox-Gay Corp.*, 231 F. 2d 859 (C. A. 6th Cir.); *In re Transvision, Inc.*, 217 F. 2d 243 (C. A. 2d Cir.). See also *In re Barchris Construction Corp.*, 223 F. Supp. 229 (D. C. S. D. N. Y.); *In re Herold Radio & Electronics Corp.*, 191 F. Supp. 780 (D. C. S. D. N. Y.).

of the collapse of the debtor. They are less commonly organized in groups or committees capable of protecting their interests. They do not have the same interest as do trade creditors in continuing the business relations with the debtor. Where debt is publicly held, the SEC is likely, as here, to have become familiar with the debtor's finances, indicating the desirability of its performing its full Chapter X functions. It seems clear that in enacting Chapter X Congress had the protection of public investors, and not trade creditors, primarily in mind. As noted above, Chapter X is one of many Acts in which the SEC has the statutory right and responsibility to protect public investors.[13] Finally, again it is clear that Congress was thinking of Chapter XI as primarily concerned with adjustment of the rights of trade creditors when it deemed the "fair and equitable" doctrine to be unnecessary to "simple" compositions in Chapter XI.[14]

*General Stores* indicates the narrow limits within which there are exceptions to this general rule that the rights of public investor creditors are to be adjusted only under Chapter X. "Simple" compositions are still to be effected under Chapter XI. Such a situation, even where public debt is directly affected may exist, for example, where the public investors are few in number and familiar with the operations of the debtor, or where, although the public investors are greater in number, the adjustment of their debt is relatively minor, consisting, for example, of a short extension of time for payment.

On the other hand, *General Stores* also makes it clear that even though there may be no public debt mate-

---

[13] *E. g.*, Securities Act of 1933, 48 Stat. 74, as amended, 15 U. S. C. § 77a *et seq.* (1958 ed.); Securities Exchange Act of 1934, 48 Stat. 881, as amended, 15 U. S. C. § 78a *et seq.* (1958 ed.).

[14] See H. R. Rep. No. 2320, 82d Cong., 2d Sess., 21; S. Rep. No. 1395, 82d Cong., 2d Sess., 11–12. Cf. *United States Realty, supra,* at 454.

rially and directly affected, Chapter X is still the appropriate proceeding where the debtor has widespread public stockholders and the protections of the public and private interests involved afforded by Chapter X are required because, for example, there is evidence of management misdeeds for which an accounting might be made, there is a need for new management, or the financial condition of the debtor requires more than a simple composition of its unsecured debts.

Applying the above principles, it is obvious that Chapter X is the appropriate proceeding for the attempted rehabilitation of respondent in this case. Here public debts are being adjusted. The investors are many and widespread, not few in number intimately connected with the debtor, and the adjustment is quite major and certainly not minor. These facts alone would require Chapter X proceedings under the above-stated principles. In addition there is here, as we have previously pointed out, substantial evidence of misappropriation of assets, and not only is there a need for a complete corporate reorganization, but it is obvious that the proposed plan of arrangement is just that. The trailer owners are exchanging their entire interests, including a sale of their trailers, in exchange for stock in a new corporation, in which other creditors of respondent, including respondent's officers and directors, as well as respondent itself will have substantial interests. Indeed, this is the same complete reorganization, except that the plan here gives the public investor creditors even less than was previously offered, see note 5, *supra*, that the SEC previously stopped as a public offering on the grounds that the offering material contained false and misleading information. The Court of Appeals itself recognized, 325 F. 2d, at 53, "that if the stock involved here were not part of an arrangement, the disclosures made with regard to it [in soliciting the trailer owners' consents to the plan] would be clearly

inadequate. No authority has been found which would indicate that recipients of stock issued in connection with an arrangement are not entitled to as much information as are those persons acquiring stock under ordinary conditions." We agree.

Indeed, the facts of this case aptly demonstrate the need for Chapter X protection as a general rule on the above-stated principles. There is clearly a need for a study by a disinterested trustee to make a thorough examination of respondent's financial problems and management and submit a full report to the public-investor creditors. Respondent has never operated profitably, has always been in precarious financial condition, and apparently was hopelessly insolvent, in both the bankruptcy and equity sense, when the arrangement was proposed. At an earlier period, its management apparently misappropriated substantial corporate funds. Most of the trailers were purchased from an affiliated company; a large number of them, although paid for, were either not manufactured or, if manufactured, were not delivered. The affiliated company is bankrupt. Only approximately two-thirds of the $3,587,439 contributed by the public investors for the purchase of trailers was used for that purpose; the balance apparently having been drained off in high commissions taken by the management on the sale of the trailers to the public. Portions of these commissions on new trailer sales were, in turn, used by the management to pay prior purchasers of trailers the rentals which they had been promised. When respondent filed its petition for an arrangement, its stated liabilities of $1,367,890 were approximately double its stated assets of $685,608; with even most of the latter ($500,000) representing the alleged "estimated" value of the trailer-rental system, i. e., the debtor's arrangements with the service station operators. The District Court itself recognized that "there may be in this situation need

for new management, and there certainly is some question . . . as to whether or not the management that is presently . . . operating it, would continue to do so for the best interests of the investors." It did not find, however, that Chapter X was necessary since this need for new management had "not been clearly established yet." One of the purposes of Chapter X is to give the independent trustee the opportunity to conduct a searching inquiry so as to "clearly establish" whether or not new management is necessary, when there is, as here, a substantial basis for such a belief. See *General Stores, supra,* at 466. Finally, it is clear that there is need for an independent investigation of possible causes of action against the past and present management of respondent, and it is as true now as when Chapter X was enacted, that "a debtor in possession cannot be expected to investigate itself." Hearings before House Committee on the Judiciary on H. R. 6439, 75th Cong., 1st Sess., 176 (my Brother DOUGLAS then testifying as Chairman of the SEC).

Respondent, however, contends that Chapter X is not here appropriate as the time and expense involved in such a proceeding would be too great. This is, however, just another way of stating the natural preference of a debtor's management for the "speed and economy" of Chapter XI, to the "thoroughness and disinterestedness" of Chapter X. In this area, as with other statutes designed to protect the investing public,[15] Congress has made the determination that the disinterested protection of the public investor outweighs the self-interest "needs" of corporate management for so-called "speed and economy." In fact, experience in this area has confirmed the view of Congress that the thoroughness and disinterestedness assured by Chapter X not only result in greater protec-

---

[15] See note 13, *supra.*

tion for the investing public, but often in greater ultimate savings for all interests, public and private, than do the so-called "speed and economy" of Chapter XI. See Twenty-Eighth Annual Report of the SEC 98 (1963); Twenty-Ninth Annual Report of the SEC 90–91 (1964); Note, 69 Harv. L. Rev. 352, 357–360 (1955). Moreover, the requirements of Chapter X are themselves sufficiently flexible so that the District Court can act to keep expenses within proper bounds and insure expedition in the proceedings.[16] We also reject respondent's further argument that the time and expense of a Chapter X proceeding would be so great that the ultimate result might be straight bankruptcy liquidation, which, respondent contends, "would mean probable total loss for [the] trailer owners." In addition to the above answers to respondent's general-time-and-expense argument, we feel compelled to point out, without indicating any opinion as to the ultimate outcome of the attempted financial rehabilitation in this case, that it must be recognized that Chapters X and XI were not designed to prolong—without good reason and at the expense of the investing public—the corporate life of every debtor suffering from terminal financial ills. See *Fidelity Assurance Assn.* v. *Sims,* 318 U. S. 608.[17]

---

[16] The court has, for example, a measure of control over the amount of work performed by the trustee, § 167, and must approve the fees of all participants in the proceedings, §§ 241–250.

[17] Both Chapters X and XI are designed as vehicles for possible financial rehabilitation. Chapter X explicitly requires that a petition brought under it must be dismissed if it has not been brought in "good faith." § 141. "Good faith" is defined so as to exclude from Chapter X those cases, *inter alia,* where "it is unreasonable to expect that a plan of reorganization can be effected." § 146 (3). Such a situation would exist where the debtor is so hopelessly insolvent that straight bankruptcy liquidation is the only available expedient. *Fidelity Assurance Assn.* v. *Sims, supra; Goodman* v. *Michael,* 280 F. 2d 106, 108 (C. A. 1st Cir.); 6 Collier, Bankruptcy,

Finally, respondent argues that the District Court's decision that Chapter XI was the appropriate proceeding here should be affirmed on the basis that it was not a clear abuse of discretion. Respondent relies on certain language in the *General Stores* opinion in support of this contention. However, in making this contention it clearly misreads that opinion and misconceives its holding and import. Nothing in that opinion supports respondent's view that the issue of whether Chapter X or Chapter XI is required permits open-ended discretion by a district court to decide on a case-by-case basis, without reliance on the principles which we have here reaffirmed, whether in its opinion it would be better for a particular debtor to be in Chapter X or Chapter XI.[18] We agree with the statement of the Court of Appeals for the Second Circuit in a recent decision that such open-ended

---

¶ 6.09 (1964). Chapter XI has a provision that a plan cannot be confirmed unless it is "for the best interests of the creditors and is feasible." § 366 (2). This provision has been construed to preclude confirmation of a plan of arrangement where the plan would pay the creditors substantially less than they might reasonably expect to realize in liquidation. See *In re Bruce Hunt Corp.*, 163 F. Supp. 939 (D. C. N. D. N. Y.); 9 Collier, Bankruptcy, ¶ 9.17 (1964).

[18] Respondent relies on language wherein, after pointing out that it "was the view of two lower courts" that the debtor there "may well need a more thoroughgoing capital readjustment than is possible under c. XI," 350 U. S., at 468, MR. JUSTICE DOUGLAS stated, for the Court: "We could reverse them only if their exercise of discretion transcended the allowable bounds. We cannot say that it does. Rather we think that the lower courts took a fair reading of c. X and the functions it serves and reasonably concluded that this business needed a more pervasive reorganization than is available under c. XI." *Ibid.* It is clear in the context of that case that the discretionary issue there referred to was not discretion to determine the rules governing the issue of whether Chapter X or Chapter XI is appropriate, or whether these rules should be applied in all cases, but rather merely the factual question of whether or not that particular debtor needed a more pervasive reorganization than a simple composition under Chapter XI.

discretion would be bound to result in decisions reflecting the "particular experience and predilections" of the district judge involved. *SEC* v. *Canandaigua Enterprises Corp., supra,* at 19. "The consequence, particularly in a multijudge district, would be that the substantial rights of the parties would depend on the accident of the calendar—in defiance of the memorable admonition, 'It will not do to decide the same question one way between one set of litigants and the opposite way between another,' Cardozo, The Nature of the Judicial Process 33 (1921)." *Ibid..* We therefore also reject this contention of respondent.[19]

Applying the above-stated principles, it is clear that in this case the motion by the SEC to dismiss, or, in effect, to transfer the proceedings to Chapter X, should have been granted.[20] Therefore, the judgment of the Court of Appeals is reversed and the case remanded to that court for proceedings consistent with this opinion.

*Reversed and remanded.*

---

[19] Respondent's further argument that Chapter XI still is appropriate since the plan, despite its clear terms, does not adversely affect the trailer owners because each of them can remove his trailer at will is also without merit. First, as noted above, Chapter X would be required here even if there were no investor-creditors. Second, the argument that the plan is voluntary ignores the fact that the investors were not purchasing trailers but were investing in the corporation. Finally, some trailers were never manufactured, others are missing, and the remainder are scattered at gasoline stations throughout the western part of the United States. It cannot seriously be contended that this right to find a trailer that was not intended to be purchased makes the plan a completely voluntary one.

[20] In so holding, we indicate no opinion as to whether or not a Chapter X reorganization would be appropriate in this case. See note 17, *supra.* We merely hold that all issues relevant to the possible financial rehabilitation of respondent must here be determined within the confines of a Chapter X, rather than a Chapter XI, proceeding. See *United States Realty, supra,* at 453; 9 Collier, *supra,* at ¶ 9.17.