**In the Matter of Orrin A. ERICSON, Debtor.**

**In the Matter of Galoris A. ERICSON, Alleged Bankrupt.**

**In the Matter of The ERICSON DEVELOPMENT CO., INC., Debtor.**

**Victor G. LANDS, M.D. and Mona Lands, Plaintiffs,**

v.

**Orrin A. ERICSON, Debtor; Galoris A. Ericson, Alleged Bankrupt; The Ericson Development Co., Inc., Debtor; Steenberg Structures, Inc.; National Bank of Commerce in Mankato, Minnesota; First National Bank of Minneapolis; Northwestern National Bank of Minneapolis; and John Doe and Richard Roe, Defendants.**

**Nos. 4–79–BKY 139(0), 4–79–BKY 140(0), and 4–79–BKY 1128(0).**
**Civ. No. 4–80–414.**

United States District Court,
D. Minnesota,
Fourth Division.

Oct. 28, 1980.

Jeremiah J. Kearney, O'Connor & Hannan, Minneapolis, Minn., for appellant Amfac Mortg. Corp.

David E. Kirkman, Stacker & Ravich, St. Paul, Minn., for appellant El Rancho Sahara Fashion Center.

Thomas G. Lovett, Jr., Ronald H. Groth, Thomson, Lovett, Wahlfors & Moran, Ltd., Minneapolis, Minn., for appellees Orrin A. and Galoris A. Ericson and The Ericson Development Co., Inc.

Hyman Edelman, Maslon, Kaplan, Edelman, Borman, Brand & McNulty, Minneapolis, Minn., for appellees Victor G. and Mona Lands.

James L. Baillie, Fredrikson, Byron, Colborn, Bisbee & Hansen, P.A., Minneapolis, Minn., for appellee First Nat. Bank of Minneapolis.

T. Jay Salmen, Kueppers, Kueppers, Von Feldt & Salmen, St. Paul, Minn., for appellee Steenberg Structures, Inc.

John E. Regan, Regan & Regan, Mankato, Minn., for appellee Nat. Bank of Commerce in Mankato.

MacLAUGHLIN, District Judge.

This matter is before the Court on appeal pursuant to Bankruptcy Rule 11–62 from a ruling by the bankruptcy court. The bankruptcy court approved a compromise settlement of an adversary proceeding between the debtor in possession and certain secured creditors in this Chapter XI case. The appellants are unsecured creditors of the debtor whose rights are affected by the terms of the settlement.

FACTS

The primary debtor in these proceedings under the Bankruptcy Act is Orrin A. Ericson ("Ericson"). (Also involved are Ericson's wife, Galoris A. Ericson, and The Ericson Development Co., Inc.) Ericson's livelihood has been the development of shopping

malls. In 1967, Ericson formed The Ericson Development Co., Inc. ("EDC"), a Minnesota corporation. He owns all of the stock of EDC and is its president and chief operating officer. Sometime between 1967 and 1970, Ericson moved his home from the Minneapolis area to Scottsdale, Arizona. He has lived in Arizona since then, but has also maintained a condominium in Edina, Minnesota, for the past few years. EDC has maintained an office in the Minneapolis area since its inception. It also had an office in Arizona for a few years, beginning with the time when Ericson moved to Arizona. Sometime between 1972 and 1974, Ericson shifted the Arizona office of EDC to Los Angeles. As will be discussed in more detail later, much of the dispute between the debtor and the secured creditors centers on whether the Minneapolis or the Los Angeles office was the "chief executive office" of EDC.

Ericson pursued his business using two basic legal forms, the corporation and limited partnerships. EDC employed people to perform the various tasks of developing a shopping center–e.g., site selection and land acquisition, engineering, construction, legal matters, financing, and leasing. Since EDC did not have enough ready cash to finance the development of shopping centers, Ericson used the technique of limited partnerships to raise money. After EDC would put together a proposal for a shopping center, Ericson would locate a financial backer and form a limited partnership in which Ericson personally would become the general partner and the financial backer would become the limited partner. It appears that most of Ericson's projects that reached the limited partnership stage never reached fruition, and resulted in large financial losses. The few that did succeed, however, were extremely lucrative. Thus, Ericson's financial status would fluctuate drastically; he would incur great debts, but could pay them off with a few successful projects.

One of the projects that did succeed was the Mankato Mall. The limited partner in that project was Victor G. Lands, a California resident. Because Ericson's partnership interest in the Mankato Mall had a substantial value, he used it to secure his other indebtedness. First, he owed Lands in the neighborhood of $1.5 million for several limited partnerships between Ericson and Lands that failed. Ericson granted Lands a security interest in Ericson's share of the Mankato Mall limited partnership to secure this debt. Second, First National Bank of Minneapolis ("FNB") had obtained a judgment for $171,346 against Ericson after default on certain unsecured debts. In October of 1978, Ericson granted FNB a security interest in his share of the Mankato Mall limited partnership to delay the execution of this judgment. Lands agreed to subordinate his secured interest to that of FNB. Third, in September of 1978, Ericson asked Steenberg Structures, Inc. ("Steenberg"), to help him obtain $300,000 to use in his business operations. Steenberg made arrangements for a loan from National Bank of Commerce in Mankato ("NBC") for the loan. NBC loaned the money to Steenberg, who in turn loaned it to Ericson. In return, Ericson assigned his interest in the Mankato Mall limited partnership to Steenberg, which then assigned it to NBC. One of NBC's prerequisites in making the loan was that it would have the first security interest in the collateral. In turn, FNB agreed to subordinate its secured interest to that of NBC. Ericson's attorneys prepared the financing statement and other documents for filing in the office of the Secretary of State of Minnesota.

Soon, however, Ericson's overextended debt caught up with him. On February 8, 1979, several unsecured creditors filed a petition for involuntary bankruptcy against Ericson. One of these unsecured creditors was Amfac Mortgage Corp. ("Amfac"), to which Ericson owed over $4.6 million. On May 7, 1979, Ericson filed a petition to convert the involuntary proceeding to a Chapter XI proceeding. On September 28, 1979, EDC also filed a petition for an arrangement under Chapter XI.

At the time the rehabilitation proceedings were commenced, one of Ericson's largest assets was his partnership interest in the Mankato Mall, the interest in which

Lands, FNB, and NBC claimed interests as secured creditors. On February 2, 1980, Lands instituted an adversary proceeding against Ericson and the other secured creditors pursuant to section 336(2) of the Bankruptcy Act, 11 U.S.C. § 736(2), and Rule 11–61. The complaint asked the bankruptcy court to determine what interests the various parties held in Ericson's interest in the Mankato Mall limited partnership. On April 4, 1980, a motion by Amfac, an unsecured creditor, to intervene in the *Lands v. Ericson, et al.*, proceeding was denied by the bankruptcy court.

The Mankato Mall itself had been sold, with the approval of the bankruptcy court, in June of 1979. The proceeds of Ericson's interest had been placed in an escrow account, and amounted to $1,121,338. By June 2, 1980, the escrow account plus interest amounted to $1,187,740.

The matter came to trial before the bankruptcy judge on May 27, 1980. The parties had originally estimated at that time that the trial would take from 8 days to 2 weeks to try. The issue revolved around whether or not Lands, FNB, and NBC had properly perfected their secured interests. They had filed financing statements only in Minnesota, and Ericson was contending that a filing in either Arizona or California was required to properly perfect the secured interest. Ericson's position was that he was not engaged in business, or if he was engaged in business, the business was operated out of the Los Angeles office. If he were to succeed in this argument, the entire value of the proceeds of the interest in the Mankato Mall would be preserved for the debtor's estate and be used in funding the arrangement to rehabilitate the debtor's business. If the argument failed, the secured parties would divide the proceeds according to their priorities. To the extent that there was a shortfall, they would become general, unsecured creditors.

On May 29, the third day of the trial, the debtor reached a compromise agreement with the secured creditors. Under the terms of the settlement, the debtor would keep $242,000 (about 20 percent) of the proceeds. The balance would be divided as follows: NBC–$305,000; Steenberg–$5,000; FNB–$140,000; Lands–$495,740. The parties presented this settlement to the bankruptcy court for approval, and the court indicated a willingness to approve it immediately. However, the court was persuaded that it was required to give a 10 day notice to all creditors and to hold a hearing on whether the settlement should be approved by the court.

The notice was given on June 3, and the hearing was held on June 19. At the hearing, the secured creditors and the debtor explained to the court the strengths and weaknesses of their cases and urged the court to approve the settlement. The unsecured creditors urged the court to reject the settlement, arguing that the debtor had a very strong chance of winning at trial, that the debtor was acting on his own behalf and thereby inadequately representing the unsecured creditors, and that the settlement would foil any plan to rehabilitate the debtor. After hearing all the arguments, the bankruptcy court indicated that it believed that the settlement was fair and providential, and that it would approve the settlement. The court issued an order to that effect on June 20. Two of the unsecured creditors, Amfac and El Rancho Sahara Fashion Center, now appeal from that ruling to this Court.

## DISCUSSION

■ Approval of a compromise advanced by the debtor is a matter that lies within the discretion of the bankruptcy court. Section 27 of the Bankruptcy Act, 11 U.S.C. § 50, provides:[1]

---

1. Rule 919(a) of the Rules of Bankruptcy Procedure sets forth the procedure:

   On application by the trustee or receiver and after hearing on notice to the creditors as provided in Rule 203(a) and to such other persons as the court may designate, the court may approve a compromise or settlement.

   Section 27 is one of the provisions of Chapters I to VII which is not inconsistent with or in conflict with the provisions of Chapter XI and is applicable in Chapter XI proceedings pursu-

The receiver or trustee may, with the approval of the court, compromise any controversy arising in the administration of the estate upon such terms as he may deem for the best interest of the estate. The subject of approval of a compromise and the standard of review on appeal are well summarized in *Collier on Bankruptcy.*

The decision of the referee in bankruptcy as to the approval or disapproval of a compromise agreement rests upon his sound discretion. Such a decision is reviewable by the district judge, but will normally not be set aside except where there is a plain error or abuse of discretion. Nor will the order of the district judge be reversed by the court of appeals unless discretion has been abused.

2A *Collier on Bankruptcy,* ¶ 27.05 (14th ed. 1975) (footnotes omitted).[2] Thus, the issue on this appeal is whether the approval of the settlement by the bankruptcy court was plain error or an abuse of discretion. The issue in the adversary proceeding of whether the secured parties had properly perfected their security interests is not now before this Court. It is relevant only so far as it sheds light on the providence of the settlement.

The focus of the appellants' argument is that the debtor was protecting his own interests when settling the claim rather than the interests of the unsecured creditors. They argue that the settlement is really a disguised liquidation, and that the bankruptcy court erred in analyzing the settlement, and therefore abused its discretion by approving it.[3]

Chapter XI, being a statutory variation of the common law composition of creditors, allows the debtor to remain in control of his assets unless a receiver or trustee has been

ant to § 302 of the Bankruptcy Act. *See* 8 *Collier on Bankruptcy,* ¶ 6.15[5], at 873–74 (14th ed. 1975). Rule 11–63(6) of the Rules of Bankruptcy Procedure, for Chapter XI proceedings, adopts Rule 919(a) quoted above except that the reference to Rule 203(a) is to be read as a reference to Rule 11–24(a).

**2.** See also 2A *Collier on Bankruptcy* ¶ 27.04, which states

The authority of the court to pass upon a compromise springs from the Act and not the former General Orders. Section 27 specifies that the compromise must be "with the approval of the court." This means that even the action and acquiescence of a majority of the creditors in number and amount is not conclusive or binding on the court. Although creditors' wishes are important and ordinarily should prevail, the court has the last word, and should consider all the factors of the situation. In *Drexel v. Loomis* [8th Cir., 35 F.2d 800], the court said:

"In determining the advisability of accepting an offer of compromise many considerations are addressed to the sound discretion of the referee . . ., among them: (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises."

The court will usually approve a compromise which results in an increase of the assets of the estate and will prove beneficial to the creditors; but it will not sanction such compromise if coupled with an agreement not to furnish evidence in a criminal proceeding against the bankrupt or in any way to stifle such prosecution. The court will not, of course, under any circumstances sanction a compromise which it feels is not in the best interests of the estate; and the compromise must necessarily be based on a valuable consideration. A minority of dissenting creditors will not be permitted to prevent a compromise of an action against the estate where it appears that the defense would probably be unsuccessful and costly, unless such creditors are willing to indemnify the estate for costs and expenses resulting therefrom.

**3.** At the hearing in this Court, the appellants argued for the first time that the bankruptcy court abused its discretion by approving the settlement prior to a hearing. When the settlement was first presented in court on May 29, the bankruptcy judge stated that he believed that notice and a hearing would be unnecessary and that he would approve the settlement. Subsequently, the secured creditors urged that the unsecured creditors be given notice of the settlement and an opportunity to object to it. Notice was given on June 3, and a hearing was held on June 19. At the hearing, every interested party was given an opportunity to present evidence and argument in favor of or against the settlement. This Court finds that the bankruptcy court considered all of the evidence and arguments presented at the hearing before making a final decision in this matter, and that there was no abuse of discretion.

appointed by the court, § 342; 11 U.S.C. § 742. In contrast to Chapter X, which governs reorganizations of large, publicly held corporations and contains many procedural and substantive safeguards for the protection of creditors and stockholders, Chapter XI provides a streamlined and summary procedure for rehabilitating a business. "The formulation of the plan of arrangement, and indeed the entire Chapter XI proceeding, for all practical purposes is in the hands of the debtor, subject only to the requisite consent of a majority in number and amount of unsecured creditors, § 362, and the ultimate finding by the court that the plan is, *inter alia*, 'for the best interests of the creditors,' § 336." *Securities & Exchange Commission v. American Trailer Rentals Co.*, 379 U.S. 594, 605–06, 85 S.Ct. 513, 519–20, 13 L.Ed.2d 510 (1965) (footnote omitted). The debtor in possession has the same rights, powers, and duties as a trustee would have, 8 *Collier on Bankruptcy*, ¶ 6.32 (14th ed. 1975), including the power to prepare a plan of arrangement and to settle claims under § 27, 11 U.S.C. § 50.

The appellants argue that an independent trustee is needed in this case because Ericson has failed adequately to represent the interests of the unsecured creditors. In support they submit that the $242,000 Ericson will receive through the settlement is only enough to pay his taxes and attorneys' fees, and that his interest in the Mankato Mall limited partnership was the only substantial asset he owned. Therefore, they argue, the settlement is really no more than a disguised liquidation, but without the safeguards that a liquidation proceeding would have. As further evidence on this, they cite the failure of Ericson to present any plan of arrangement.

However, the appellants have presented only circumstantial evidence in support of their claim that Ericson failed to protect their interests. It is true that Ericson has not yet presented a plan, but it is not surprising that he would wait on preparing a plan until he knew how much of the proceeds from the interest in the Mankato Mall would be available for use in the plan. In addition, the appellants give no indication of what assets Ericson still retains to support their assertion that the interest in the Mankato Mall was the only major asset of the estate, nor of the amount of his unsecured debt. More importantly, they provide no other support for their claim that Ericson will be unable to come up with any workable plan. Ericson's brief contradicts appellants' assertion, claiming that he can now come up with enough money to make a sufficient deposit to begin a plan. The bare minimum needed is $350,000. With the $242,000 of settlement proceeds, he has a realistic chance of coming up with that amount; if he had lost the lawsuit and come away empty handed, he would have had no chance to raise that amount of money.

The bankruptcy court agreed that a plan is feasible after the settlement, and concluded that Ericson's intent was to go forward with a plan rather than go into liquidation. At the hearing on June 19, the bankruptcy court stated:

> Obviously, this by itself, this isn't going to dispose of anything in the Chapter 11 proceedings. It was never hoped to do that. I don't think there would be enough money here if you took the whole kitty, so to speak, to totally fund the plan. The hope was that somewhere in the future, there would be an ongoing process here, whereby more money would be fed in. That was the plan Mr. Lovett, or the outlines of the plan, he first suggested to the creditors here.

(Tr. June 19, 1980, p. 65). Moreover, appellants' argument that Ericson has failed to protect their interests is weakened by the fact that Amfac's attorney advised and aided Ericson's counsel throughout the preparation of the case for trial. Amfac became dissatisfied with the Ericson's representation of the unsecured creditors only when Ericson decided that the better course was to settle rather than continue the trial.

The appellants next argue that approving the settlement was an abuse of discretion because Ericson had such a strong chance of

winning the trial that settling indicates bad faith on the part of Ericson. The bankruptcy judge declined to state how he thought he would ultimately rule on the merits of the case. Indeed, to attempt to make a definitive ruling would have been unwise, for the only basis on which to make the determination was two days of testimony, the exhibits that the parties either had introduced or intended to introduce into evidence, and the statements by the parties of what they expected to establish at trial. This Court, too, will not attempt to make a definitive determination of how the merits of the preference issue should be decided. It is sufficient to set forth the strengths of each side, and then try to estimate the debtor's chances of prevailing at trial.

The heart of the perfection issue is a factual determination of where the debtor is located. Section 9–103(3)(d) of the Uniform Commercial Code[4] provides: "A debtor shall be deemed located at his place of business if he has one, at his chief executive office if he has more than one place of business, otherwise at his residence." The methodology that the trial court would have had to follow if the trial had been continued would be as follows. Is Ericson engaged in business? If no, then the filings must be made in Arizona, his place of residence. If yes, then is his business operating EDC or supervising limited partnerships? The answer to this question helps to answer the next question, which is: where is the location of the place of business? If EDC is Ericson's business, then a choice must be made between the California office and the Minneapolis office. If supervising limited partnerships is his business, then the location where Ericson does most of his work in supervising the work of the partnerships is his place of business.

The following are the highlights of the evidence that Ericson thought that he would present at trial in support of his position.

1. Ericson resided in Arizona, and there would be sufficient testimony and evidence to conclude that he was only an employee of EDC, and therefore not engaged in business.

2. If Ericson was engaged in business, then the court must conclude that EDC's "chief executive office" was in Los Angeles because it was the financial control center of EDC:

a) checkbooks kept there; and all checks issued from there;

b) financial records kept there;

c) all dead records kept there, and duplicates of all records of Minneapolis office kept there;

d) Ericson used California accountants for his personal matters.

3. Comment 5(c) to U.C.C. § 9–103 supports his interpretation of chief executive office when it says "the place where persons dealing with the debtor would normally look for credit information."

4. FNB recognized the Los Angeles office as the chief executive office because it mailed one of its demands for payment to that office and not the Minneapolis office. FNB also identified Los Angeles as the office of the debtor when entering its judgment.

The following are the highlights of the evidence that the secured parties intended to produce at trial in support of their position.

1. Ericson was clearly engaged in business because he owned all of the stock of EDC and was its president, and was also the general partner of a number of limited partnerships.

2. The Minneapolis–area office was the chief executive office of EDC because:

a) it was much older than the L.A. office;

b) it had more floor space;

c) it had many more employees, and more categories of employees (including architects, designers, planners, lay-

---

**4.** Each of the three relevant states, Minnesota, Arizona, and California, have adopted the 1972 Amendments to U.C.C. § 9–103. *See* Minn. Stat.Ann. § 336.9–103; Ariz.Rev.Stat.Ann. § 44–3103; Cal.Com.Code § 9103 (West).

out, and accounting personnel), which the Los Angeles office did not have;

d) EDC's general legal counsel was located in Minneapolis;

e) the great bulk of EDC's work was carried on in the Minneapolis office—at least 12 of 17 projects;

f) EDC purchased a condominium for Ericson's use near the Minneapolis office, but not near the Los Angeles office;

g) EDC gave Ericson a car for his use in Minnesota, and Ericson kept his Minnesota drivers license.

3. The limited partnership agreement for the Mankato Mall states that the Minneapolis office of EDC shall be the principal place of business. Other limited partnership agreements also say the same thing.

4. Ericson is estopped from denying that EDC's principal place of business was in Minnesota because of several actions and statements made by Ericson and his agents:

a) Ericson represented to Lands and NBC that he would give them valid secured interests, and help them prepare and file the documents necessary to perfect the secured interests. Ericson represented on these documents that EDC was located in Minnesota and never suggested that a filing in California would be necessary to perfect the secured interest.

b) EDC's corporate registrations in Arizona and California state that EDC's principal office is in Minnesota.

c) In filing his Chapter XI petition, Ericson stated that EDC's principal place of business was in Minnesota.

A brief perusal of this evidence shows that the issues are fully joined, and that the trier of fact would have some difficult decisions to make. However, in view of the obvious strength of intended evidence of the secured parties, Ericson's settlement for 20 percent of the amount in controversy is not so out of line with his chances of success that it should be rejected.

■ The appellants next contend that the bankruptcy court erroneously relied on some of the arguments put forth by the secured parties. First, they allege that the ongoing expense of the litigation should not have been considered as a reason for approving the settlement. However, the complexity, expense, and likely duration of the litigation is an appropriate factor for a court to consider when deciding whether to approve a settlement. *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968); *Drexel v. Loomis*, 35 F.2d 800, 806 (8th Cir. 1929). The trial involved here could have continued for two weeks beyond the time when the settlement was reached. With the number of lawyers involved, the expense promised to be substantial. The bankruptcy court could properly give substantial weight to this factor in making its determination.

The appellants argue that the bankruptcy court should not have considered the estoppel argument of the secured parties. They assert that Ericson's role as debtor must be separated from his role as trustee, and that Ericson's actions as debtor cannot prevent him from exercising his powers as trustee.

At the hearing on the settlement, the bankruptcy court considered this issue using the following terms:

Lastly, there is a substantial question, it seems to me, of a possible estoppel in more than one way and in more than one matter here. That was in the record as it was before me then, the handling of these papers in connection with the Priority Certificates and in other matters, too. Now, Mr. Baillie suggests what I didn't really realize then that inquiry in these other places would have redirected you back here to Minnesota. All of these are things that go to the estimate of the value of the litigation[.]

(Tr. of June 19, 1980, p. 66). Neither side has presented any persuasive authority on the critical issue here of whether a debtor in possession under Chapter XI can be estopped from exercising his powers as trus-

tee by his own prior acts. The bankruptcy court took the correct approach. It did not indicate which way it would rule on the issue. Instead it indicated that the issue was another matter of uncertainty in the litigation. In a situation where a trial is complex and the outcome uncertain, a settlement between the parties is generally a prudent alternative.

█ Finally the appellants argue that the bankruptcy court failed to conduct a "strident and piercing inquiry into the reasonableness of the settlement," and that it was required to explain in detail how it weighed the strengths and weaknesses of the case. In support of their position, they cite *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). However, the level of scrutiny of the compromises involved in that case does not apply here. *TMT Trailer Ferry* dealt with an intricate corporate reorganization under Chapter X of the Bankruptcy Act. The policies underlying Chapter X and Chapter XI are vastly different. Chapter X is designed for large, publicly–held corporations and contains many elaborate safeguards for creditors and stockholders. Chapter XI is designed for small businesses and sacrifices many safeguards in the interest of speed and efficiency. *See generally Securities & Exchange Commission v. American Trailer Rentals Co.*, 379 U.S. 594, 603–07, 85 S.Ct. 513, 518–20, 13 L.Ed.2d 510 (1965). Against this background, a detailed statement of reasons is more appropriate for Chapter X proceedings than for Chapter XI proceedings. *Cf. In re Blair*, 538 F.2d 849 (9th Cir. 1976) (held that dictates of *TMT Trailer Ferry* do not apply in liquidation bankruptcy context).

Even if the same level of scrutiny were required in this case, the record shows that the bankruptcy court made an intelligent consideration of the relevant factors. Although the written order is brief, it indicates the basis of the decision and incorporates all of the exhibits the parties presented, the two days of testimony heard, and the arguments made at the June 19, 1980 hearing. At the June 19 hearing, the parties made a very thorough presentation of the pros and cons of the issues in the case and of the settlement. At the conclusion of the hearing, the bankruptcy court gave a more detailed discussion of the reasons for the decision than is found in the order. This statement of reasons is ample to show that the court adequately and intelligently considered the issues, and to permit a review of the decision on this appeal.[5]

Based on the foregoing, the appellants have failed to make any showing of abuse of discretion. The bankruptcy court made an adequate inquiry into the wisdom of the settlement, and was correct in deciding that the terms of the settlement were not out of line with Ericson's prospects of recovery. Considering the amount of uncertainty regarding the outcome of the litigation and the expense involved, the settlement for 20 percent of the amount in controversy was in the best interest of the estate.

Therefore, the ruling of the bankruptcy court is affirmed.

5. Appellants also contend that the bankruptcy court failed to make a reasoned determination of Ericson's likelihood of success on another issue in the trial of whether FNB received a voidable preference when it obtained its security interest. At the hearing, the bankruptcy court declined to make a detailed estimation of the likely outcome of this issue, stating that from the presentations by the parties, it seemed that FNB had a good chance of success. The statements indicate that the court considered this issue to be another element of uncertainty and expense in the litigation. This was the correct approach. Moreover, a thorough discussion of the merits was unnecessary, for even if Ericson succeeded in striking down FNB's secured interest as a voidable preference, the remaining claims of other secured parties would still be more than enough to exhaust the funds in the escrow account.