**In re PIONEER WAREHOUSE
CORPORATION, Debtor.**

**Bankruptcy No. 78 B 602.**

United States Bankruptcy Court,
E. D. New York.

June 21, 1979.

Julius Zizmor, New York City, for debtor and debtor-in-possession.

Tenzer, Greenblatt, Fallon & Kaplan, New York City, for Seligmann & Heiden.

Beekman & Bogue, New York City, for Paine, Webber, Jackson & Curtis Inc.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

Hortense F. Seligmann and Rita F. Heiden, individually and as trustees, creditors of the debtor, have moved this Court for an order adjudicating the debtor a bankrupt under Chapters I through VII of the Bankruptcy Act, or, in the alternative, for an order dismissing the debtor's Chapter XI petition. The ground for both motions is that the debtor-in-possession has failed to prosecute diligently the pending Chapter XI proceeding, and has failed to propose, file, or confirm a plan of arrangement. The same creditors have also moved to appoint a receiver to take charge of the property and operate the business of the debtor in place of the debtor-in-possession. Paine, Webber, Jackson & Curtis, Inc. ("Paine, Webber"), which has filed a claim, disputed by the debtor, for $202,937.14, has joined in the motion to dismiss the Chapter XI petition.

Notices of these motions and of the hearings to be held thereon were duly sent all creditors and interested parties. The hearing on the application to appoint a receiver was held on March 16, April 6, and May 7 and 23, 1979; the hearing on the motions to dismiss or adjudicate were held on May 7 and 23, 1979. Mesdames Seligmann and Heiden appeared by counsel in support of the motions to appoint a receiver or to dismiss or adjudicate; Paine, Webber, through its counsel, supported the motions to dismiss.

At the hearing on March 13, 1979, Pioneer Warehouse Corporation ("Pioneer"), the debtor and debtor-in-possession, was represented by Robert Rosen, who opposed the appointment of a receiver; at the hearing on April 6, 1979, Mr. Rosen withdrew as attorney for Pioneer. Thereupon, the Court entered an order directing Pioneer and its president to retain counsel on or before May 7, 1979, or suffer dismissal. At the hearing on May 7, 1979, Julius Zizmor applied orally for permission to represent Pioneer, and his retention was authorized by order dated May 10, 1979. At the hearing on May 23, 1979, Pioneer, through Mr. Zizmor, opposed the appointment of a receiver, the dismissal of this proceeding, or the adjudication of the debtor.

For the reasons hereinafter set forth, and upon the basis of all the proceedings had herein, this Court is granting the motion for an order adjudicating the debtor a bankrupt. It finds this action to be in the best

interest of the creditors of Pioneer and of the estate.

## THE FACTS

The recital which follows is based upon all the proceedings had herein, including testimony during the course of the various adversary proceedings, during the First Meeting of Creditors and other hearings, admissions in affidavits submitted on behalf of the debtor and debtor-in-possession, admissions in pleadings, and all other documents of record.

Many of the facts relevant to this proceeding are set forth in two earlier decisions of this Court: one dated March 22, 1979, sustaining the objection of the debtor to the claim of Arnold Weissberger; the other dated January 26, 1979, imposing various restrictions on the operation of the debtor-in-possession. Those two opinions supplement the recitals which follow, and should be read in conjunction with this opinion.

A. *Pioneer's Pre-petition History.*

Pioneer is a one-man corporation. Its stock is owned 100 percent by Marshall P. Safir ("Safir"), who is Pioneer's president and sole executive officer. Pioneer's business is the storage of business records, a business which it carries on in a ten-story building located at 41 Flatbush Avenue, Brooklyn, New York. It succeeded to the lease of that building in 1969 when Safir and his brother-in-law, Arnold Weissberger, liquidated their joint ownership of some eight to ten corporations engaged in various facets of the business of moving and storage, freight forwarding, and ocean carriage.

Pioneer's lease was executed in 1960 for a term of 25 years, which expires in 1985. The lessors are Hortense F. Seligmann and Rita F. Heiden, individually and as trustees under an *inter vivos* trust agreement. Mrs. Heiden and Mrs. Seligmann each own three-eighths of the property individually, and the trust, in which they have no beneficial interest, owns two-eighths. Their counsel has described them repeatedly, without contradiction, as elderly, 85-year-old or over; one, he has said, is directly dependent on the rentals received from Pioneer for her living expenses.

Pioneer's lease is of a character designed to relieve the lessors of any responsibility for the premises while permitting them to share in the profits of its operation. The lessee undertakes to pay all charges, including taxes, water, and sewer rents; to pay a base rent of $100,000 a year in equal monthly installments, plus a percentage of all income over $275,000, and a still larger percentage, if the income exceeds $325,000. The security called for by the lease is $100,000. The lease contains a standard bankruptcy clause entitling the lessors to terminate on three days' notice in the event that the lessee files a petition in bankruptcy or insolvency, or for an arrangement for reorganization.

When Safir and Weissberger broke up their partnership, one of the documents they executed was a letter agreement with respect to how the income of Pioneer was to be spent. The letter agreement reflects their belief that the Pioneer lease would continue generating substantial income for its entire term. Under one of its terms, Weissberger was to be hired as a consultant by Pioneer at a salary of $30,000 per year, not to be paid, however, until all the amounts set forth in an annexed schedule had been paid in full to the persons listed, or their assignees. The individuals named were all relatives and friends of Weissberger and Safir; for example, Safir's wife was listed as owed $25,000, his brother, $65,000. The amounts listed represent loans personally guaranteed by the two men, or by the corporations owned by them. Pioneer has never in fact paid Weissberger anything under the letter agreement. (His claim in this proceeding for $570,000 based on all the terms of that agreement has been disallowed in its entirety by this Court.) But while Pioneer has paid Weissberger nothing, it has paid out between 1969 and the filing of the petition in this proceeding, $200,000 to the listed individuals.

Pioneer's income has been drawn off freely by Safir for other purposes. One of the constituent elements of the small em-

**4**

pire of related businesses dissolved in 1969 had been Sapphire Steamship Lines, Inc. ("Sapphire"). That company had earlier been put out of business and ultimately forced into bankruptcy through the illegal concerted action of various shipping lines. *Rates on U.S. Government Cargo Docket No. 65–13, 11 F.M.C. 263 (1967).* In Sapphire's bankruptcy proceeding in the Southern District of New York, $2,473,070 has been recovered from the shipping lines in settlement of Sapphire's claims for antitrust violations. Cf., *In re Sapphire Steamship Lines, Inc.,* 509 F.2d 1242 (2d Cir. 1975).

However, since at least 1969, Safir, independently and wholly outside the bankruptcy proceeding, has been carrying on litigation in the courts of New York and of the District of Columbia based on the acts which put Sapphire out of business. A full recital of this litigation would burden this opinion unduly. Its history is fully set out in the opinion of this Court written on January 26, 1979. It is sufficient for present purposes to note that Pioneer is not a party to any of this litigation and has no interest in it. Nevertheless, in order to carry on this litigation and also to pay other personal expenses, like Safir's rent at his home, Safir withdrew from Pioneer, up to the time of the filing of the petition herein, the sum of $268,041.00.

Profitable as Pioneer's lease may have been, it proved inadequate to sustain the withdrawal of nearly $500,000 over a limited period of years, $200,000 to Safir's friends and relatives and $268,000 to finance his litigation and personal expenses.

In 1974, Pioneer began to fall behind in its rent, forcing its elderly landladies to use up their security to meet taxes, rents, and water charges. Safir has testified: "While the company (Pioneer) was profiting, the repayment of all of these loans had drained cash from the company and this was the basis originally of the first settlement agreement that we made with the landlord."

In January 1975, suit was brought against Pioneer in the New York Courts for nonpayment of rent. To avoid loss of Pio-

neer's lease Safir agreed, in April, 1975, to pay up all arrearages and restore the security no later than May 31, 1976. Subsequently, the agreement was modified to give Pioneer up to October 31, 1977 to pay up.

When Pioneer failed to do so, notice of default was served on November 1, 1977. Such notice entitled Mesdames Seligmann and Heiden, under the terms of the settlement agreement, to immediate possession unless the default was cured within thirty days. On March 23, 1978, there was returnable in the New York Civil Court a motion for a final judgment awarding the lessors possession of the premises and a money judgment in the sum of $139,105.68. But even as the motion was pending, Safir filed in this Court the petition which stopped the state court proceedings in midair. All legal actions against the debtor were stayed, both by operation of law and by formal order of this Court dated March 23, 1978.

**B.** *The Petition and Accompanying Affidavit*

Pioneer's petition, which was prepared by Safir *pro se,* stated that Pioneer was insolvent and planned to propose a plan of arrangement. The reason for Pioneer's difficulties as set forth in the accompanying affidavit, required by Rule XI–2 of the Bankruptcy Rules of the Eastern District, and sworn to by Marshall P. Safir, was that its cashflow had been broken by the refusal of its major tenant, Paine, Webber, to pay for its storage space. This break, Pioneer claimed, allowed the landlord to press for default under existing settlement agreements. The petition added: "The nature and extent of potential conspiracy between landlord and Paine, Webber, Jackson & Curtis is not yet known."

The reference in the petition is to a dispute between Paine, Webber and Pioneer which began in January, 1977. Since this dispute remains to be tried by the Court, it would be improper to describe it in detail at this time. In brief, in January, 1977, Paine, Webber gave notice to Pioneer of its intention to store its records elsewhere and, thereafter, rented substitute space. No rent was paid by Paine, Webber to Pioneer

subsequent to March, 1977. However, Pioneer refused to relinquish Paine, Webber's records or accede to its departure. This led to extensive litigation in the New York courts beginning April, 1977 initiated by Paine, Webber to compel Pioneer to give Paine, Webber access to its records and to surrender their possession. Up to the time this proceeding was filed, Pioneer continued to hold these records. Based on these events, Paine, Webber has filed a claim in this proceeding against Pioneer for $202,-937.14, to which Pioneer has objected and, in turn has asserted a counterclaim against Paine, Webber in the amount of $100,000. (In return for being permitted to remove its records, Paine, Webber has agreed to try these claims in this Court.)

The reference to a conspiracy in the petition reflects Safir's belief that Paine, Webber determined to move its records, and the landlord subsequently decided to evict Pioneer, in order to cut off the funds with which Safir has been pursuing his feud with the shipping lines. At Safir's insistence, his counsel have conducted extensive discovery intended to uncover this underlying conspiracy. The expeditious disposition of the various adversary proceedings brought in this matter has been delayed on the ground that they cannot be brought to a conclusion without such discovery. But not a scintilla of evidence has been produced in its support.

During Pioneer's fiscal year ending April 30, 1977 before the loss of Paine, Webber's rentals, Pioneer's gross receipts were $426,-342.05. According to Safir, Paine, Webber that year paid about $39,000 for 13,000 square feet. Other income was also realized from it for incidental services. Safir estimated that without Paine, Webber, Pioneer would earn $340,000 in the year following the filing of the petition, because the building was one-third empty. (In fact due to an increase in its storage charges, Pioneer appears to have received $425,000.00 during that year, or nearly exactly what it earned before Paine, Webber stopped paying. Pioneer's income during the year ending April 30, 1978 is not known to the Court.)

The original petition claimed total assets of $584,207.00 and total liabilities of $155,-621. Neither the original petition, nor the schedules which later supplemented it, included as a liability the $100,000 security owed the Mesdames Seligmann and Heiden. Nor did they reflect a claim by the New York State Tax Commission for $139,947 for unpaid sales tax dating back to May 31, 1973 on which a hearing had been scheduled for January 17, 1978, two months earlier.

Three items constitute the bulk of the assets claimed by the petition: $57,023 allegedly owed by Paine, Webber, $268,041 described as "Investment in Maritime Suit —M. P. Safir" and $227,418 representing "Claims Receivable—Sapphire S.S. Lines". Since filing the petition, Safir has admitted that some of these "Claims Receivable" were expunged in the Sapphire bankruptcy proceeding two months earlier in January, 1978. Further, counsel for Mesdames Seligmann and Heiden has stated that some of the assigned claims duplicate those earlier assigned his clients; he questions whether in view of all their infirmities they have any value whatever.

Rule XI–2 of the Bankruptcy Rules of the Eastern District require a Chapter XI petition to be accompanied by an affidavit of the debtor setting forth, among other details, the "names and addresses of the ten largest creditors" and "the nature and present status of each action or proceeding pending . . . against the debtor or his propert, where . . . the seizure of his property may be imminent." Rule XI–2(b)(2) and (3). The affidavit filed by Safir in ostensible compliance with this Rule did not list Mesdames Seligmann and Heiden as one of Pioneer's ten largest creditors although the amount shown in the petition as owed the "landlord", otherwise unidentified, $39,037, was more than shown for any other creditor. Further, the list of pending actions omitted entirely the pending eviction proceedings in the New York courts which clearly had precipitated the filing of the petition.

C. *Pioneer's Post-Petition History*

On March 28, 1978, still acting *pro se,* Safir obtained an order authorizing the debtor to continue its business as a debtor-in-possession. Thereafter, Pioneer, exploiting to the full the shelter of the bankruptcy laws, stopped making any payments whatever for the use and occupancy of the warehouse from which it continued to derive a handsome income. From March 23, 1978 until July 31, 1978, the elderly ladies who owned Pioneer's warehouse received not a single cent from Pioneer.

On March 30, 1978 they exercised their election under the lease to terminate it so that it expired in April 3, 1978. However, this act restored neither possession, nor income. To secure these, their counsel commenced an adversary proceeding on April 13, 1978 to modify the stay of the eviction proceedings, and on May 3, 1978 moved for an order fixing monthly rentals to be paid for use and occupation. Pioneer strongly contested the request that it pay for the use and occupation an amount equal to the rental reserved in the lease. Pointing to the fact that the warehouse was one-third vacant, it proposed that its rental be reduced by an equal amount. Not until after a full trial, the testimony of an expert, and hours of legal time, were Mesdames Seligmann and Heiden able to establish what the full record of the past year makes abundantly clear, which is, that Pioneer's lease remains lucrative, and the rental called for under the lease is wholly consistent with the value of the property. On September 13, 1978, the Court found "fair use and occupancy" to be the rent set forth in the lease. On October 1, 1978, Pioneer resumed paying full rental. Under the close supervision of the Court, timely payments are now being made so that the owners of the property are now at least receiving a regular income from it.

The adversary proceeding has not as yet been tried. It was delayed initially because of Pioneer's claimed need for discovery respecting the alleged conspiracy between its landladies and Paine, Webber; then it was adjourned because the plaintiffs were reluctant to assume the burden and expense it represented.

At the same time that Pioneer was paying nothing to its landladies for the use of their property, it was continuing to underwrite Safir's personal expenses and his steamship litigation. Between March 23, 1978, the date on which the Chapter XI petition was filed, and July 30, 1978, the debtor-in-possession spent over $23,000 for the personal expenses of Marshall Safir and for his feud with the shipping lines without any attempt to gain prior Court authorization therefor. These expenditures were in addition to the generous salary of $500 a week permitted by the Court. These unauthorized expenditures included a $6,000 membership in the Glen Oaks Country Club.

While some of the expenditures were obvious on the face of Pioneer's monthly reports, the discovery of the unauthorized expenditures for prosecution of Safir's litigation with the shipping industry was delayed by the fact that they were concealed under innocent-sounding titles. For example, the statement for April, 1978 described monies, later specifically identified, as having been withdrawn to pay for the various maritime suits as "Advance Sales and Travel Fund (M. P. Safir)." In the May, 1978 statement, $1,700 of the $3,550 taken that month for this litigation was dubbed "Sales Expense." In June, 1978, $2,500, and in July, 1978, $2,200, was explained the same way.

On August 30, 1978 the Court made clear that no funds were to be spent on Safir's lawsuits without authorization of this Court to be made on written application on notice to creditors. The following day on September 1, 1978 Safir withdrew $10,000 for these lawsuits. On September 13, 1978 in the presence of Mr. Safir, his counsel stated that Mr. Safir was unwilling to make the application required to obtain authority for the use of Pioneer's moneys to fund the maritime litigation and, consequently, he was prepared to refund the amount identified at the previous hearing, $12,450, as having been withdrawn for that purpose. Not disclosed by either Mr. Safir or his counsel was the fact that an additional $10,-000 had been withdrawn for the same unau-

thorized purpose the day following the prior hearing.

The Court did not learn of the withdrawal until the monthly operating statement of the debtor-in-possession for September, due, under the Rules of the Court and under the Order authorizing the debtor to remain as a debtor-in-possession, on October 15, 1978, was filed, almost two months late, on December 5, 1978. When the Court inquired of Mr. Safir on October 27, 1978 as to the September report, he responded: " . . . the September statement will be filed in the next few days. There was an accountant, Mr. Cully the C.P.A. who is handling the thing, was out of town for two weeks. He will be back on Tuesday and I'll file the statement soon, thereafter."

At the hearing on November 14, 1978, when Safir knew, but the Court did not, that he had withdrawn $10,000 on September 1, 1978 for the maritime litigation, bringing his improper withdrawals up to $27,070.15, he represented to the Court that the $25,000 which he was to receive from the sale by his wife of their marital home for $500,000 on December 1, 1978 would cover everything which had been improperly taken. .

After the Court had been advised of the $25,000 Safir was to receive on December 1, 1978, the following colloquy took place:

THE COURT: All right, but since nothing is going to happen until December 1st, it seems to me that we should have a clear statement sometime before December 1st, so that we can get an assignment covering all the moneys that should be recouped which obviously are not just the moneys owing on September 13th, but whatever moneys were spent subsequent to September 13th.

MR. ROSEN: (ATTORNEY FOR PIONEER): Mr. Safir said the operating statement for September and October would be filed on or before November 22nd. By that time we should have the figures and at the time the statement is filed, Judge, I can send a letter to the Court advising you of the expenses that have been advanced since July 30th, for

August, September and October. In this assignment of proceeds on December 1, they can be included in that figure; is that correct Mr. Safir?

THE WITNESS (MR. SAFIR): Yes, I didn't know that the month of August was not already included.

\*    \*    \*    \*    \*    \*

THE COURT: He's been ordered by Judge Hall to restore the money covered up to July 30th, and I am now directing you, Mr. Safir, to restore the money subsequent to July 30th of the same general character.

Mr. Rosen, the attorney for Pioneer, undertook to obtain from Mr. Safir's son, who had a power of attorney to make the sale, an assignment as follows:

From the proceeds of that sale there will be an assignment to Pioneer Warehouse in the amount of $17,070.15, and to be added to that amount any other disbursements that have been advanced to Marshall Safir personally in the month of August, September and October, which was used by Mr. Safir to pursue the "maritime claims."

THE COURT: Which have been advanced since July 30th, without any cut-off rate, and which are similar to the expenditures.

I believe you, Mr. Safir, but you may find in going over the records that there are some current expenditures that somehow fell into it, that have been made.

THE WITNESS (MR. SAFIR): That is possible, your Honor. I would say that to establish this, so that there be no question about what my son is willing to do, that the amount to which he is prepared to go on this thing would be a total of $25,000 or thereabouts, and it should cover it, but beyond that he will make no commitment at the present time.

I think it should cover it, but that's his commitment to you. So that's it.

In fact, $25,000 was not enough to cover withdrawals which totalled at least $27,-070.15. In point of fact, all that was repaid to Pioneer was $17,070.15.

On December 22, 1978, it turned out that all but $1,000 of the $25,000 received by Safir from the sale of the house was gone, leaving counsel for Mesdames Seligmann and Heiden to remonstrate:

"The $25,000 was specifically represented to this Court as being available for these repayments and now it turns out that $6,000 of it has disappeared. If that isn't contempt of this Court, I just don't know what is."

Subsequent to these events the Court entered a series of orders designed to put an end to the improper use of Pioneer's funds. It imposed various restrictions on the debtor-in-possession, including a requirement that all its checks be countersigned by the Court. It memorialized the prohibition on the use of Pioneer's moneys to fund Safir's maritime litigation. When the Court imposed these restrictions, it stated that if these orders "fail of this goal, other steps will have to be considered."

Safir was explicitly directed by order of January 14, 1979 to repay the $10,000 withdrawn on September 1, 1978. Another order was entered on April 10, 1979 directing him to repay $2,178.29 subsequently discovered to have been improperly withdrawn for the same character of expenditures previously disapproved. Notices of appeal have been filed from these orders but the appeals have not been perfected. Meanwhile they are not obeyed. Furthermore examination by the Court of the report for May 1979 shows that Pioneer's money is still being spent improperly. Apparently the Court overestimated the control it was in a position to exercise, in view of the other demands on its time, over this debtor-in-possession.

To date, no progress has been made towards filing a plan of arrangement. No such plan was filed with the petition and none has been filed since then, although this Court, in an order which was never rescinded, directed such a plan to be filed no later than October 31, 1978.

Pioneer has excused its failure to file a plan of arrangement on the ground that as a condition precedent it must determine the magnitude of the claims against it. But, it has done little or nothing to liquidate any claim except that filed by Arnold Weissberger, Safir's brother-in-law.

Objection to the priority tax claim of the New York State Tax Commission for $139,-947.34 filed on October 27, 1978 was not filed until the attorney for the landladies inquired of Pioneer's counsel on February 9, 1979 as to whether it was disputed.

Trial of the claim of Paine, Webber for $202,937.14 and of Pioneer's counterclaim of $10,000 has been repeatedly delayed by counsel for Pioneer on the grounds that further discovery was needed.

The claims filed against Pioneer total $589,044. While very little hard information respecting the assets claimed by Pioneer in its petition has been presented to the Court, there is reason to believe that they have little, or no, value.

Pioneer has had great difficulty retaining counsel to represent it in this proceeding. On October 3, 1978, Jules V. Speciner, the counsel originally retained on April 19, 1978 withdrew precipitously. He was not replaced until November 30, 1978 by Mr. Rosen. On April 6, 1979, Mr. Rosen withdrew as suddenly as had Mr. Speciner.

When it looked as though Pioneer would be content to remain indefinitely without counsel, thus putting these proceedings in a deep freeze indefinitely, the Court entered an order on April 26, 1979 directing Pioneer to retain counsel on or before May 7, 1979 or suffer dismissal. On the return date of this order, Julius Zizmor, attorney at law, applied for an order authorizing his retention and an order authorizing retention of Mr. Zizmor was entered by this Court on May 10, 1979.

It is in the light of this record that the attorneys for Mesdames Seligmann and Heiden have requested that this Chapter XI proceeding be dismissed, or the debtor adjudicated.

Dismissal of this Chapter XI proceeding or conversion to bankruptcy is requested by Pioneer's creditors for failure to

prosecute diligently and for failure to propose, file or confirm a plan of arrangement. "[W]ant of prosecution" is one of the grounds which Bankruptcy Rule 11–42(b) specifically names as authorizing dismissal or conversion of a Chapter XI proceeding.[1] Bankruptcy Act § 376 (11 U.S.C. § 776) provides similar relief for failure to propose an arrangement "in the manner and within the time fixed by the court."[2]  Both sections permit dismissal or adjudication only after hearing on notice to the debtor and creditors, subject to the requirement that the action be in the "best interest of the estate." *Banque de Financement v. First National Bank of Boston,* 568 F.2d 911, 916 (2d Cir. 1977).

▮ The Bankruptcy Court also enjoys inherent power to dismiss a Chapter XI petition. *SEC v. United States Realty & Improvement Co.,* 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940); *Ira Haupt & Co. v. Klebanow,* 348 F.2d 907 (2d Cir. 1965). Under its inherent power, the Bankruptcy Court may act *sua sponte* without notice. *Banque de Financement v. First National Bank of Boston, supra,* at 916 n.8 (citing *In re Ettinger,* 76 F.2d 741 (2d Cir. 1935)); *Mecca Temple of Ancient Arabic Order of Nobles of Mystic Shrine v. Darrock,* 142 F.2d 869 (2d Cir. 1944), *cert. denied,* 323 U.S. 784, 65 S.Ct. 271, 89 L.Ed. 626 (1944).

In this case, the Court is adjudicating the debtor a bankrupt both pursuant to its inherent power and pursuant to Bankruptcy Act § 376 and Bankruptcy Rule 11–42(b).

### A.  *Dismissal Under The Court's Inherent Power.*

As the Second Circuit noted in *Banque de Financement v. First National Bank of Boston, supra,* the Bankruptcy Court's inherent power to dismiss a Chapter XI petition is delineated in *SEC v. United States Realty & Improvement Co., supra.*  The limitations of Chapter XI permit dismissal "in the exercise of its [the court's] equity powers under Chapter XI for the purpose of safeguarding the public and private interests involved and protecting its jurisdiction from misuse."  310 U.S. at 456, 60 S.Ct. at 1053. In *United States Realty,* dismissal was sought so as to remit the debtor to more appropriate relief under Chapter X, but, as the Second Circuit held in *Ira Haupt, supra,* the more appropriate relief may equally be straight bankruptcy.

▮ Chapter XI is subject to misuse because of the absence of safeguards of the character to be found in Chapter X, or, for that matter, in straight bankruptcy:

"Every phase of the procedure bearing on the administration of the estate and the development of the arrangement is under the control of the debtor.  The process of formulating an arrangement and the solicitation of consent of creditors, *sacrifices to speed and economy every safeguard, in the interest of thoroughness and disinterestedness, provided in Chapter X.*  The debtor is generally permitted to stay in possession and operate the business under the supervision of the Court, § 342, and a trustee is provided for only in the case where a trustee in bankruptcy

---

**1.** Rule 11–42(b) provides in pertinent part: "*(b) Dismissal or Conversion to Bankruptcy for Want of Prosecution, Denial or Revocation of Confirmation, Default, or Termination of Plan.*  The court shall enter an order, after hearing on such notice as it may direct dismissing the case, or adjudicating the debtor a bankrupt if he has not been previously so adjudged, or directing that the bankruptcy case proceed, whichever may be in the best interest of the estate—(1) for want of prosecution; * * *."

**2.** Section 376 reads, so far as pertinent: "If the statement of the executory contracts and the schedules and statement of affairs, as provided

by paragraph (1) of section 324 of this Act, are not duly filed, or if an arrangement is not proposed in the manner and within the time fixed by the court, * * *  the court shall—* * * (2) where the petition was filed under section 322 of this Act, enter an order, upon hearing after notice to the debtor, the creditors, and such other persons as the court may direct, either adjudging the debtor a bankrupt and directing that bankruptcy be proceeded with pursuant to the provisions of this Act or dismissing the proceeding under this chapter, whichever in the opinion of the court may be in the interest of the creditors * * *."

has previously been appointed and is in possession, or if 'necessary' a receiver may be appointed." (Footnote omitted) *SEC v. United States Realty & Improvement Co.*, 310 U.S. at 450–51, 60 S.Ct. at 1051. (Emphasis added.)

■ One of the safeguards sacrificed is the total absence of any provision "for an independent study of the debtor's affairs." 310 U.S. at 451, 60 S.Ct. at 1051. This is necessarily one of the most serious drawbacks to Chapter XI. Pioneer's creditors are not the first to note that "a debtor in possession cannot be expected to investigate itself." *SEC v. American Trailer Rentals Co.*, 379 U.S. 594, 617, 85 S.Ct. 513, 526, 13 L.Ed.2d 510 (1965). Thus, where there is "need for an independent investigation of possible causes of action against the past and present management," Chapter XI is inappropriate. *Ibid.*

In *General Stores Corp. v. Shlensky*, 350 U.S. 462, 466, 76 S.Ct. 516, 519, 100 L.Ed. 550 (1956), the Supreme Court noted some of the circumstances in which Chapter XI is inappropriate and unfair to creditors:

"Readjustment of the debt structure of a company, without more, may be inadequate unless there is also an accounting by the management for misdeeds which caused the debacle.

"Readjustment of the debts may be a minor problem compared with the need of new management. Without a new management today's readjustment may be a temporary moratorium before a major collapse."

That these criticisms of Chapter XI were made in circumstances in which the result would have been to leave the debtor to his remedy under Chapter X does not make them any less valid when, for different reasons Chapter X is likewise unavailable, and only straight bankruptcy remains.

"The same principles by which a court of bankruptcy was held to have inherent power to dismiss a Chapter XI petition where relief was properly to be had under Chapter X, without benefit of the express authority now contained in § 328, *SEC v. United States Realty & Improvement Co.*, 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940), authorize it to dismiss a Chapter

XI petition when it finds that there is no prospect of rehabilitation and that ordinary bankruptcy is the appropriate vehicle." *In re Ira Haupt & Co. v. Klebanow, supra*, 348 F.2d at 908.

■ The equity powers of the bankruptcy court are not, however, without limits. The circumstances under which it may be evoked "are limited by the express terms of the Bankruptcy Act." *Banque de Financement v. First National Bank of Boston, supra*, 568 F.2d at 915. As the Second Circuit noted, "most dismissals prompted by circumstances which arise *after* the filing of the petition—such as failure to file the required statements and schedules or to submit a plan," would be covered by § 376 of the Act and Rule 11–42(b). Then, as already noted, dismissal is permitted only after hearing on notice and a specific finding that the action is in "the best interest of the estate."

■ However, not all circumstances which arise *after* the filing of a petition and which justify dismissal are necessarily embraced by Rule 11–42. *Banque de Financement v. First National Bank of Boston, supra*, 568 F.2d at 915 n.5. Nor do the Act and Rules cover the absence of good faith in the initial filing or acts *prior* to bankruptcy.

Not included within the relatively narrow procedural grounds set forth in the Act and Rules is the extensive misuse which this record reflects of the Court's jurisdiction.

1. *The Jurisdiction of this Court Has Been Misused.*

Both the timing of the filing of the petition and events subsequent thereto compel the conclusion that the petition was not filed in good faith for the purpose of arriving at an arrangement with Pioneer's creditors, but simply to block the eviction proceedings which would have resulted in the loss of Pioneer's one real asset, its very lucrative lease. No plan of arrangement was filed with the petition, and fifteen months later there is still neither a plan, nor a suggestion of a plan, although the Court in an Order which has never been formally rescinded directed such a plan to be filed no later than October 28, 1978.

Pioneer claims that no plan is possible until its dispute with Paine, Webber is resolved. But, far from trying to hasten that resolution, Pioneer has skillfully blocked and frustrated every effort of counsel for Paine, Webber and of the Court to move those proceedings along.

If Pioneer had any intention of proposing a plan, it would have long since been trying to expunge or reduce the state's priority tax claim for sales taxes of $139,947. Yet, no objection to it was even filed until Pioneer's counsel was prodded by Pioneer's creditors as to his intentions.

The inference is inescapable that Pioneer's objective is not the conclusion of a plan of arrangement (which would automatically bring to an end Pioneer's sojourn in this Court), but the indefinite continuation of these proceedings so that it can continue in possession of the premises from which it derives all its income.

The misuse of Chapter XI goes beyond its invocation to frustrate eviction, rather than seek rehabilitation.

The breathing space Chapter XI was designed to afford an honest debtor for the arrangement of its affairs has been seized upon by Pioneer as an excuse to cut off all income to the aged women who own the property from which Pioneer has profited so handsomely and to divert the income to the pleasures and pursuits of Pioneer's owner, Safir. From March 23, 1978 to August 1, 1978, insulated by the bankruptcy laws from any reprisal, Safir used Pioneer's money to pay his golf club dues and subsidize his legal vendetta, while his landladies received not a single cent.

The landlord's legitimate request for payment for use and occupation equal to the rent reserved in the lease is almost the only matter which Pioneer has strenuously litigated. Despite the enormous profitability of that lease, Safir unblushingly sought to cut down the income to the landlord, even while he was using Pioneer's funds to pay his golf club dues, cover his multiple parking tickets, and subsidize his trips to Washington, D.C. Not until October 1, 1978, and then only under the compulsion of an order of this Court, did the two women who own Pioneer's warehouse start receiving the regular income to which they are entitled.

But while the Court has been able to channel some of Pioneer's income to its proper recipients, it has been wholly unable to stop the improper diversion of its funds into Safir's pockets. Despite the most strenuous efforts of counsel for the creditors, despite the fact that the Court has devoted hours of hearings to reviewing Pioneer's expenditures, despite repeated oral and written orders that no money of Pioneer is to be used to defray the costs of Safir's personal feud with the maritime industry, even despite the fact that the Court has undertaken the laborious task of countersigning all Pioneer's checks, the misuse of Pioneer's funds continues.

Thus, for example, the monthly statement for May, 1979 reflects a payment of $375 to the Congressional Information Bureau which Safir, had earlier identified on September 13, 1978, as the "trade journal of the steamship industry." Following such identification, he had been ordered by the Court to pay back the monies spent for the Bureau's services prior thereto, and, in fact, had done so. Nevertheless, as the May, 1979 statement shows, this improper use of Pioneer's funds continues.

The Court's orders to Safir to restore such withdrawals as the creditors and the Court have been able to identify as improperly expended have turned out to be totally futile acts. Safir has never restored the $10,000 he was directed to return by order of January 19, 1979, nor the $2,178.29 that he was directed to restore by order of April 10, 1979. Instead, he has filed appeals which lie unperfected.

■ Throughout this proceeding, Safir has continued to treat Pioneer's funds as available to him as freely as before the petition was filed. While Chapter XI provides a procedure for protecting creditors from a diminution of the assets of a debtor by reason of the legitimate expenditures incurred in the continued operation of the debtor's business by the debtor-in-posses-

sion, it cannot cope with illegitimate incursions into a debtor's funds. It is totally unsuitable where the debtor-in-possession cannot be relied upon to recognize its fiduciary obligation to its creditors.

In this connection, it is pertinent to note that the full picture of the administration of Pioneer's business by the debtor-in-possession is not even known to the Court. Some disclosure has been made of its expenditures, but little is known of its income, except what Safir has elected to report. This is because, as the Supreme Court noted, "Every phase of the procedure bearing on the administration of the estate * * is under the control of the debtor." *SEC v. United States Realty & Improvement Co., supra,* 310 U.S. at 450, 60 S.Ct. at 1051.

2. *No Debtor-in-Possession Will Investigate Itself.*

But the catalogue of Chapter XI inadequacies is not yet complete. Pioneer's petition lists two assets to which it assigns a value of close to $500,000, a sum almost sufficient to pay all its creditors in full even without reduction of any of the contested claims.

Half that sum consists of the debt owed Pioneer by Safir; the other half represents claims against Sapphire Shipping Company, acquired by Pioneer from Safir's close relatives, including his wife, his brother, and his cousin. There is more than a suggestion in the record that some of the claims against Sapphire assigned Pioneer by Safir's relatives are valueless. Some have already been expunged in the Sapphire bankruptcy. Full investigation of the circumstances under which Pioneer exchanged good money for dubious claims might well uncover substantial assets for Pioneer's creditors. Yet, it is self-evident that only an independent trustee, not the debtor-in-possession, would ever make such an investigation. Along similar lines, only an independent trustee would ever collect the small fortune owed Pioneer by Safir, or at least, definitively establish its uncollectibility.

But, it is precisely when management is suspect, as here, that Chapter XI is most deficient. *SEC v. American Trailer*

*Rentals Co., supra,* 379 U.S. at 614, 85 S.Ct. 513. For the reason alone that $500,000 in Pioneer's claimed assets is unlikely to be recovered without an independent trustee, Chapter XI is unsuitable.

3. *No Plan Seems Likely.*

Also bearing on the inadequacy of Chapter XI is the fact that there seems to the Court to be no possibility of the debtor's rehabilitation in light of the underlying facts. However, there are so many other reasons making Chapter XI unsuitable that exploration of this issue in depth appears unwarranted and the Court is not relying on it as a reason for dismissing this proceeding. Even if Pioneer could extricate itself from its present debts, its prospects do not seem to be of the character that would attract investors. Its sole asset is a lease which has already been terminated.

All that Pioneer has ever vouchsafed is that were it to win its fight with Paine, Webber, it would propose a plan. But even assuming *arguendo* that Paine, Webber is not a creditor, but a debtor, no plan seems possible in view of the expressed determination of Pioneer's landladies, and its largest creditor, not to approve any plan and to evict Pioneer from their property.

"However honest in its efforts the debtor may be, and however sincere its motives, the District Court is not bound to clog its docket with visionary or impractical schemes for resuscitation." *Tennessee Publishing Co. v. American National Bank,* 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13 (1930).

4. *The Hurt to Third Parties.*

Finally, there is a consideration present here which must also be weighed wherever a court of equity, like a bankruptcy court, is involved, and that is, the possible detriment to innocent third parties, the balance of hurt.

The two aged ladies who own the warehouse Pioneer is currently operating are adversely affected in multiple ways by the continuance of Pioneer in possession. According to Pioneer, the building is now one-third empty. This fact necessarily cuts

down the rent which is payable and therefore reduces current income, it also affects adversely the landlord's reversionary interest.

As long as Pioneer is protected in its possession by this Court, the owners of Pioneer's warehouse are helpless to cure the underutilization of their valuable property. Indeed, this very proceeding may well be responsible, in part, for such underutilization. The uncertainty as to Pioneer's own tenure must necessarily impede its ability to lease warehouse space. According to Safir, tenants for storage space prefer long leases to avoid having to be put to the cost of moving. Pioneer cannot offer such leases any more.

Further, the Court finds it difficult to believe that Paine, Webber's difficulties with Safir have not hurt Pioneer's ability to lease space.

As long as this proceeding continues, and Pioneer remains in possession, the owners of Pioneer's warehouse are unable to take any action to increase their income from the warehouse. Moreover, even to continue receiving that income they are put to constant expense while their counsel tries to compensate for the safeguards lacking from Chapter XI. True, they might be able to recapture possession of their property by pressing the adversary proceeding now pending in this Court having as its objective the lifting of the stay preventing them from obtaining a judgment of eviction in the courts of New York. But, first, they can do so only at some considerable expense and personal burden. Second, such a course does not restore to them the existing arrears in rent, requiring the constant attendance of their counsel at these proceedings, because of the abuse by Pioneer, of its freedom as a debtor-in-possession.

In sum, in view of all the circumstances, and, in particular, the hurt being done the owners of Pioneer's warehouse by the initiation and the continuation of this proceeding, the inequitable conduct of Safir, the improper use of the assets of the debtor-in-possession and the need for an independent trustee to investigate the past and present misdeeds of management, the Court is dismissing this proceeding and adjudicating the debtor a bankrupt pursuant to its inherent power as an equity court.

B. *Dismissal Under Bankruptcy Act § 376 and Bankruptcy Rule 11–42(b).*

The Court is also acting under the authority of § 376 of the Act and Rule 11–42(b) for the reasons stated in the moving papers.

The record demonstrates "want of prosecution" beyond peradventure. Safir has had fifteen months in which to reorganize the debtor's affairs, to make a settlement for the debtor's creditors, to obtain outside financing, to propose a plan of arrangement, or otherwise bring this Chapter XI proceeding to a conclusion, but he has, in fact, accomplished none of these things.

Rather than prosecute this proceeding, Safir has managed to bring everything to a grinding halt for months at a time by ridding himself of whoever happens to be Pioneer's current counsel. On October 3, 1978, Jules V. Speciner insisted upon being relieved, leaving Pioneer without counsel until November 30, 1978; on April 6, 1979, Robert Rosen, who had gained numerous extensions because of the necessity of familiarizing himself with Pioneer's affairs, withdrew equally precipitously, leaving a vacancy that was not filled until the Court threatened dismissal on that ground alone. What could be a more compelling demonstration of lack of prosecution than the fact that out of the fifteen months this proceeding has been pending, the debtor-in-possession has been without counsel for nearly one-fifth of the time.

That no plan of arrangement has been filed is undisputed. No more is known about such a plan than fifteen months ago when the petition herein was filed.

As already noted, § 376 of the Bankruptcy Act and Bankruptcy Rule 11–42(b) authorize dismissal after a hearing on notice to creditors. That hearing has been held; the sole creditors who were present strongly opposed the continuation of this Chapter XI proceeding, differing solely on whether

it should be dismissed or converted to straight bankruptcy.

There remains only the substantive requirement that the action of the Court be in the best interest of the estate. *Banque de Financement v. First National Bank of Boston, supra,* 568 F.2d at 921, 922. That the creditors are ill-served by the continuation of this proceeding is manifest. Attendance at the Court hearings and the constant effort required to police Safir's use of Pioneer's funds is a steady drain on their finances, which produces no return.

True, as long as the proceeding continues, Pioneer continues to enjoy some income which will end upon its termination, and which generates some monies that might eventually go to its creditors. But, the sums produced so far are minimal compared with Pioneer's debts and there is no certainty that even this minimal income will continue. And, finally, it is being generated at the expense of Pioneer's major creditor, the owners of Pioneer's warehouse.

Not to be overlooked is the fact that replacement of the debtor-in-possession with an independent trustee might produce substantial assets for Pioneer's creditors, which might more than counterbalance the loss of the small income currently being generated by Pioneer's continued occupancy of the premises under the protection of the Court.

There remains the question whether dismissal or adjudication is in the best interest of creditors. But for the possible assets that a trustee might be able to collect for the benefit of all creditors, the Court would have elected dismissal. However, to ensure equitable distribution of whatever assets a disinterested trustee may be able to recover out of the $500,000 in assets listed on Pioneer's petition, adjudication is dictated.

Accordingly, the Court finds that it is in the best interest of the estate to adjudicate the debtor a bankrupt, and thus convert this proceeding into one which will continue under Chapters I through VII.

This disposition makes moot the application to appoint a receiver. Accordingly, it is denied without prejudice to its renewal should that become necessary.

An order is being issued contemporaneously consistent with this opinion.