# In re CONTINENTAL MORTGAGE INVESTORS, Debtor.

### No. 76–593–S.

United States District Court,
D. Massachusetts.

June 6, 1980.

See also, Bkrtcy., 5 B.R. 771.

Alan Lefkowitz, Gaston Snow & Ely Bartlett, Boston, Mass., for debtor.

Robert F. White, Sherburne, Powers & Needham, Boston, Mass., for Debentureholders Committee "A".

Guy B. Moss, Widett Slater & Goldman, Boston, Mass., for Debentureholders Committee "B".

Robert M. Gargill, Choate, Hall & Stewart, Boston, Mass., for Senior Creditors' Committee.

Nathan Fuchs, New York City, for Securities Exchange Commission.

Daniel M. Glosband, Goldstein & Manello, Boston, Mass., for trustee.

### MEMORANDUM AND ORDER ON COMPROMISE

SKINNER, District Judge.

Presently before me in this reorganization proceeding under Chapter X[1] is an application by the Chapter X Trustees for approval of a compromise of the claims of senior creditors. The compromise was originally generated by representatives of the debtor, the senior creditors and a Debentureholders' Committee (which has since been designated as "Committee A") with the thought that the case would then be re-transferred to Chapter XI. I advised the parties that I was of the opinion that this matter could not be disposed of in Chapter XI consistently with *In re Continental Investment Corp.*, 586 F.2d 241 (1st Cir. 1978). Further, in an opinion dated November 20, 1979, I stated that a report by the Chapter X Trustees on the proposed compromise and distribution of it to all creditors and stockholders with a notice of hearing would be a prerequisite to approval. This report was filed, appropriate notice of hearing was given to all stockholders and creditors, and a hearing was held from April 7 to April 16, 1980, involving substantial testimony and documentary evidence.

The compromise is supported by the Chapter X Trustees, the debtor's directors and counsel, the Senior Creditors' Committee, and Debentureholders' Committee A. Opposed is Debentureholders' Committee B. It is not clear to what extent, if any, either committee speaks for holders of junior debt other than its own committee members. Committee B circularized the entire list of holders of junior debt, seeking a straw vote on approval of the compromise. This was done without the prior knowledge or approval of the court. An overwhelming majority of those who sent back the "preferential" vote form were opposed to the compromise. They constitute 813 out of 1,622 holders representing a face amount junior debt of $16,292,000 out of the total outstanding of $40,382,000. The circular, however, was so negatively weighted, and con-

---

1. Some of the facts and prior proceedings are described in *In re Continental Mortgage Investors*, 578 F.2d 872 (1st Cir. 1978). Subsequently, an appeal was taken from the bankruptcy judge's decision to deny the debtor's transfer motion to Chapter X. I reversed, withdrew the reference and transferred the case to Chapter X by order of May 1, 1979. This order was appealed by the senior creditors. Further appellate proceedings were stayed on the appellant's representation that a compromise was being negotiated. The Court of Appeals remanded the case for consideration of the compromise but retained appellate jurisdiction.

tained so many statements of fact proved at the hearing to be false [2] that it was virtually predicable that those who responded at all to Committee B's solicitation would respond negatively. Accordingly, I shall assign little significance to this straw vote.

The SEC has participated at every stage. Counsel for the SEC has stated that he takes no position on approval of the compromise. He nevertheless has been severely critical of effecting the compromise outside of a Chapter X plan, has doubted the legality of the proceedings and has challenged the fairness of the proposed compromise, charging that the senior creditors, banks for the most part, are "walking away with the estate." In his peroration at the hearing, however, counsel urged that the court use its good offices to effect a settlement, *i. e.*, a compromise of the compromise. What appears to be a puzzling ambivalence I believe should be taken as reflecting the desire of the SEC that all of the elements of the compromise be subjected to rigorous scrutiny and challenge so that the compromise would be based on the informed consensus of the parties.

All of the following discussion lies in the shadow of one solemn fact: the face amount of the senior debt, plus interest to the date of the debtor's original Chapter XI filing exceeds the total assets of the debtor. If the strict priority of Chapter X is imposed, absent equitable subordination of the senior debt, or the imposition of liability for fraudulent transfers, the senior creditors will "walk away" with the entire estate. Even though the debtor is now experiencing a substantial positive cash flow, and has in fact accumulated about $150 million in cash, this situation is not likely to change unless the creditors are deprived of their money for an unconscionable period while the debtor accumulates interest on its cash.[3]

The proposed compromise contemplates:

(a) The withdrawal of the pending appeal.

(b) The settlement of all claims against the senior creditors based on equitable subordination, subordination of Eurodollar claims under governing English law and fraudulent transfers.

(c) The creation of a "core company" for the benefit of holders of junior debt and shareholders [4] which would retain two of the debtor's assets, Hawaii Loa Ridge, near Honolulu, and the Dream Inn and Annex, a resort hotel with assorted related properties in Santa Cruz, California. In addition, the core company would retain $6 million allocated for various purposes and would assume various liabilities of the debtor unrelated to specific assets.

(d) All of the remaining assets of the debtor ("the transfer assets") would be transferred to a new corporation called "Senior Corp." to be liquidated for the benefit of the senior creditors.

(e) Senior Corp. would provide limited "end financing" for purchasers of lots in Hawaii Loa Ridge.

I. *The Propriety of the Compromise Procedure*

Under Section 27 of the Bankruptcy Act:

"The receiver or trustee may, with the approval of the court, compromise any controversy arising in the administration of the estate upon such terms as he may deem for the best interest of the estate."

11 U.S.C. § 50 (1976).

On its face, the statute sets out only two conditions to a valid compromise—that the

---

**2.** *E. g.*, it was alleged that certain financing for the reorganized company would be impossible to obtain, but in fact it has been obtained.

**3.** Accordingly, the appeal of the senior debt holders from my order of May 1, 1979, putting this case into Chapter X is far from frivolous. This appeal is one of the elements of the compromise.

**4.** Part of the original compromise plan includes participation by the shareholders. It is presently tentatively contemplated by the Trustees that the claims of shareholders against the debtor for frauds in connection with the issuance of securities will entitle them to be treated as creditors and to participate in the reorganization plan.

trustee deem it to be in "the best interest of the estate" and that it receive court approval.

Section 27 vests the district courts with broad powers to approve compromises which meet the statutory requisites of "fairness and equity", e. g., *Florida Trailer & Equipment Co. v. Deal*, 284 F.2d 567, 571 (5th Cir. 1960) Typically, in Chapter X cases such compromises are effected within the framework of a reorganization plan, *Florida Trailer, supra; In the matter of Equity Funding Corporation of America*, 416 F.Supp. 132 (C.D.Cal.1975), but in some instances have been considered concurrently with the formation of a plan. *In re Associated Gas & Electric Co.*, 61 F.Supp. 11 (S.D. N.Y.1944), *aff'd* 149 F.2d 996 (2d Cir.), *cert. denied*, 326 U.S. 736, 66 S.Ct. 45, 90 L.Ed. 439 (1945). In the present case, the Trustees offer the proposed settlement prior to the submission of a reorganization plan, and it is their present view that without the consummation of this compromise no viable reorganization can be achieved.

The threshold question, therefore, is whether a compromise which disposes of the largest class of securities, and in the process divests the debtor of most of its assets may be accomplished other than as part of a formal reorganization plan. The Court of Appeals in *In re Continental Investment Corp., supra*, said that the crux of a Chapter X reorganization proceeding

> is "to afford greater protection to creditors and stockholders by providing greater judicial control over the entire proceedings and impartial and expert administrative assistance . . . through appointment of a disinterested trustee and the active participation of the SEC." "The basic assumption of Chapter X . . is that the investing public dissociated from control or active participation in the management, needs impartial and expert assistance in the ascertainment of facts, in the detection of fraud, and in the understanding of complex financial problems." (citations omitted).

586 F.2d 241, 245. *SEC v. American Trailer Rentals Co.*, 379 U.S. 594, 85 S.Ct. 513, 13 L.Ed.2d 510 (1965) reflects the same view. While these considerations are paramount under Chapter X, these courts recognize that the Act provides district courts with a large measure of flexibility in their implementation. *American Trailer Rentals*, 379 U.S. at 618, 85 S.Ct. at 526; *In re Continental Investment Corp.*, 586 F.2d at 250. For example, in *CIC* a plan of reorganization had been formulated under Chapter XI, but because it contemplated a "major reorganization" the court held that the case had to be transferred to Chapter X. In responding to the argument that the transfer would add expense, delay and uncertainty to the rehabilitation, the First Circuit stated:

> As the Court [in *American Trailer Rentals*] noted, Chapter X is flexible. If adequate investigations have in fact been carried out, the trustee ought to be able to compress his investigation accordingly. If the plan worked out is indeed the best one for all parties concerned, it is likely the trustee can utilize substantial parts of it. If the groundwork has all been laid, implementation of the final plan could be expedited. 586 F.2d at 250

As the Supreme Court noted in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968):

> Compromises are "a normal part of the process of reorganization." *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 130, 60 S.Ct. 1, 14, 84 L.Ed. 110 (1939). In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts. At the same time, however, it is essential that every important determination in reorganization proceedings receive the "informed, independent judgment" of the bankruptcy court. The requirements [of Chapter X] that plans of reorganization be both "fair and equitable," apply to compromises just as to other aspects of reorganizations. (citations omitted).

Congressional policy towards the strict formal requirements of Chapter X has undergone a change:

> The record of the Senate hearings on S. 2266[5] and the House hearings on H.R. 8200[4] is replete with evidence of the failure of the reorganization provisions of the existing Bankruptcy Act to meet the needs of insolvent corporations in today's business environment. Chapter X was designed to impose rigid and formalized procedures upon the reorganization of corporations and, although designed to protect public creditors, has often worked to the detriment of such creditors.

124 Cong.Rec. H11,101 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards); 124 Cong.Rec. S17,417–18 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini). Of course, the provisions of the old act still apply, but the foregoing quotation gives me confidence that a flexible interpretation of it will not offend current national policy.

 It is clear, nevertheless, that any basic re-ordering of the debtor's assets and creditors' interests should ordinarily be accomplished through a formal reorganization plan. Committee B, in arguing against the present compromise, makes the excellent point that debentureholders are being asked to approve the compromise without definite information as to the division of interests in the "core company" between themselves and the shareholders. The voting provisions of Chapter X, furthermore, will be by-passed in the approval of a re-ordering of interests which would ordinarily be part of a plan. Proponents of a far-reaching compromise outside of the framework of a comprehensive reorganization plan have the serious burden of persuasion that special circumstances justify such a departure from the statutory norm.

 The special circumstance here is time. The senior creditors are willing to make a deal to secure prompt payment. At the interest they can now obtain on their money, this is not surprising. They aver that the senior creditors would never vote affirmatively on a reorganization plan any more favorable to the junior debt than this compromise.[6] If the senior creditors are forced to defend against claims of equitable subordination and fraudulent transfers, I believe it is reasonable to expect that the senior creditors will insist on absolute priority. Counsel for the Trustee suggested strongly at the hearing that if this compromise cannot be effected, the Trustees are likely to recommend liquidation. I subscribe to the Trustees' pessimistic estimate of the chances of success of the equitable subordination and fraudulent transfer claims as described in detail in their report, and discussed more fully hereinafter. In short, if the opportunity to salvage something for the junior debt and the shareholders is not seized soon, it is very likely, in my opinion, that there will be little if anything left to fight over after the senior creditors have exercised their right to strict priority.

I conclude that approval of the compromise is warranted as a matter of law in this Chapter X proceeding, even prior to the presentation of a comprehensive plan of reorganization, provided that it is in all respects "fair and equitable." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc., supra.*

II. *The Fairness and Equity of the Compromise*

The issues affecting the fairness and equity of the compromise may be divided into three principal categories:

(A) The fairness of the appraisal of the transfer assets;

(B) The probability of the Trustees' success in recovering allegedly fraudulent transfers and subordinating the claims of senior creditors, and the probable value thereof to the estate;

---

5. Ultimately, the revised Bankruptcy Act, P.L. 95–598, approved November 6, 1978, in which entirely new and different reorganization provisions were enacted.

6. Trustees' counsel is of the opinion that a formal plan would take a year to work through the various required stages.

(C) The viability of the core company, which is in turn wholly a factor of the appraisal of its key asset, Hawaii Loa Ridge;

## A. The Transfer Assets

The assets to be transferred to Senior Corp consist of 150 parcels of real estate and mortgage loans valued by the Trustees as of March 31, 1980 at $317,846,000. The valuation of these assets has been challenged on two grounds: (1) that an independent appraisal has not been conducted on many of the properties and (2) that the debtor's files show evaluations by the staff members which are more optimistic. The evaluations were made by Mr. Henri Bourneuf, one of the Chapter X Trustees with the assistance of Mr. Paul Lazzaro, the other Trustee, and members of the debtor's staff. Mr. Bourneuf, a former president of one of the nation's few successful real estate investment trusts (REITs), testified that he would have bought, sold, held, or developed this real estate as a professional manager on the basis of the information which he had in making these evaluations. His testimony on examination and several days of cross-examination led me to believe that his evaluation was careful, expert and reliable. In the valuation of real estate, the experience, judgment and trained intuition of the evaluator are the prime considerations. I have confidence in Mr. Bourneuf and accept his testimony. When his opinion differed from that of others, he was able to state clear and persuasive reasons for his opinion. Insofar as the compromise depends on the acceptance of his valuations of the transfer assets, I am of the opinion that it is fair and equitable.

## B. Equitable Subordination, Fraudulent Transfers and Related Matters

The discussion of equitable subordination, Eurodollar problems and the possibility of fraudulent transfers which appears in the Chapter X Trustees' Preliminary and Partial Report is comprehensive. No effective challenge to the Trustees' conclusion was presented at the hearing. Evidence was presented concerning the cost of further discovery which tended to confirm the Trustees' conclusion.

Opponents had no more to say than that further investigation should be undertaken. The Trustees have the benefit of an SEC investigation and of fairly extensive discovery by the indenture trustee, Citibank, N.A. The discovery is not complete,[7] but the results are undoubtedly indicative of a pattern. If the Trustees are obliged to bear the expense of a full pre-trial preparation to the tune, as appeared in evidence, of some $1,280,000, then the advantages of settlement are to that extent lost. *Florida Trailer, supra* at 573. I am satisfied that there has been sufficient investigation to support an informed judgment. The Trustees' analysis of the applicable law is confirmed by my own research, and, in my opinion, is correct. I am satisfied that the evaluation by the Trustees of the likelihood of success, and the value to the estate thereof, of any challenge to the senior creditors on the basis of equitable subordination and fraudulent transfers is fair and reasonable.

■ Counsel for the SEC argues that some of the senior creditors have harmed the estate during the year or so prior to the Chapter XI filing and should be held to account for their conduct. It is clear that their strategy was to obtain maximum benefits for themselves, which should surprise no one; that some of their conduct harmed the estate, and that some of their conduct is actionable. Nevertheless, I accept the Trustees' conclusion as to the limited benefits to be achieved for the estate from pursuing these potential claims. The test is a pragmatic one. A proceeding under the Bankruptcy Act was designed to be a salvage operation, not a morality play.

## C. The Viability of the Core Company

The key to the viability of the core company is the marketability of its proposed major asset, Hawaii Loa Ridge. Hawaii

---

**7.** At least not by the compulsive standards of modern lawyering.

Loa Ridge is an undeveloped plateau within convenient commuting distance of Honolulu, commanding a superb view of the ocean and of the dramatic coastline from Diamond Head to Hawaii Kai. There is no dispute that the highest and best use of the property is for residential development, specifically luxury single family dwellings. "Luxury single family dwellings" in the Hawaiian economy and in particular with reference to this property means lot prices ranging from $105,000 to $265,000, and finished units expected to sell for twice that amount. There are 554 lots laid out on 200 acres, with extensive park, recreation and conservation areas.

The expert appraiser engaged by the Trustees presented an elaborate analysis of the cash flow expected from the sale of these lots. The net cash receipts over a projected 40 month development period, after deducting cost of development, but including "developer's profit" is said to be $60,237,000. "Developer's profit" is calculated to be $14,811,000, leaving an ultimate return on the land itself of $45,426,000. In Exhibit 4-0, the Appraisal Report, this amount is discounted at a rate of 11% to a present value of $34,829,000. At the time of the hearing, the prime rate was over 19%, leading the appraiser to use a higher discount rate, giving a present value of $33,000,000. Mr. Bourneuf thought it ought to be $30,000,000 because the extraordinary interest rates then prevailing would require an even higher discount rate. As of this writing, some six weeks later, the prime rate is around 16%. I assume the appraiser's present fair market value would now be back at $34,829,000. The discounted value of developer's profit is said to be $11,000,000.

In assessing the fairness of the proposed compromise, the Chapter X Trustees have ignored the possibility of developer's profit inuring to the core company for the reasons (1) that it is speculative and (2) that the core company may not develop the tract itself.

The validity of the discounted present value, and the viability of the Hawaii Loa Ridge development with respect to cash flow is dependent on the time it will take to realize the projected lot prices. The appraiser, Mr. Wrobel, refers to this as the absorption rate, that is the rate at which lots will be "absorbed" by the market, or in plain terms, sold. Mr. Wrobel relied on an Absorption Analysis (Exhibit 4L) prepared by his staff and updated to account for market conditions in March 1980 and the increase projected lot prices (Exhibit 4M and testimony of Uson Y. Ewart).

The Absorption Analysis is divided into four parts: (1) a statistical study of the supply of residential real estate on Oahu generally and in the prime area around Honolulu in particular, (2) a historical analysis of absorption rates on Oahu, (3) an opinion survey and (4) a "derived demand" based on projected population growth. The historical analysis, the opinion survey and the "derived demand" study all deal with the potential demand for luxury housing at the price level contemplated for Hawaii Loa Ridge. The "derived demand" is an attempt to quantify the demand by demographic statistics.

This demographic analysis unfortunately falls short of the mark. While it provides some basis for determining what percentage of the potential buyers for new housing will be making an annual income of over $64,000, this does not really identify the market for the Hawaii Loa Ridge lots. In order to finance housing at the projected level, buyers would have to enjoy an annual income of $95,000 and up. There is no statistical basis of estimating the size and depth of that market.

The historical analysis, the supply study, and the opinion survey tends to support the appraiser's conclusions, however. The real estate brokers report a strong market including the existence of cash buyers from overseas, e. g., Japan, Hong Kong, Canada and Saudi Arabia, as well as local landowners whose equity has grown dramatically with the rapid increase in Hawaiian real estate prices, and who are said to be ready to buy better property without substantial financing.

The optimism of local real estate people concerning the market for Hawaii Loa Ridge was confirmed by Mr. Bourneuf, who conducted his own survey of local experts with whom he had past experience and in whom he had confidence. Even Committee B's expert, Mr. Stark, testified that there was "pent-up" demand for high grade residential property like Hawaii Loa Ridge.

The failure of the report to quantify the demand of a statistical basis was sharply criticized by counsel for Committee B. It would indeed be comforting to have solid statistical support for the market analysis. Rarely is it available; appraisals are commonly accepted or rejected on the basis of the experience and judgment of the expert appraiser. Even that standard centerpiece of valuation, the reference to comparable property is highly subjective, depending on the judgment of the appraiser as to what is "comparable."

I am satisfied that there has been sufficient investigation of the supply, the historical absorption rate and the potential market, even without the purported quantitative statistical analysis to support Mr. Wrobel's conclusion. Failure to suffuse a real estate appraisal with the aura of scientific accuracy is not surprising; the really important elements of the appraisal are the experts' associative and subjective judgments of value. Reliance on such judgments unquestionably entails a risk, as does any decision based on prediction.[8]

I adopt two tests for determining whether the level of risk is acceptable.

1. Is the expert respected by his peers in the field and of proven accomplishment in dealing with real estate? In my opinion, both Mr. Wrobel and Mr. Bourneuf meet this test.

2. What are the consequences of a reasonably foreseeable margin of error? Mr. Connor, the comptroller of the debtor, testified as to the projected cash flow of the core company. He testified that the core company would be a viable and profitable entity even

if the present value of Hawaii Loa Ridge is $25,000,000, and might be even at $20,000,000. It is possible that Mr. Wrobel and Mr. Bourneuf have over-valued the property by nearly 40%, but, in my· opinion, not likely.

Furthermore, offsetting the risk of over-valuation there is the possibility of "development profit", which the Chapter X Trustees have prudently ignored. Nevertheless, as counsel for the SEC most eloquently pointed out, for purposes of Chapter X, valuation should be made not on the basis of present fair market value, but on the value of the reorganized entity as a going concern, which includes its capacity to make a profit.

Accordingly, I accept the appraisal of Hawaii Loa Ridge at $34,829,000.

The other assets assigned to the core company of the Dream Inn and Dream Inn Annex. The Dream Inn is a resort hotel in Santa Cruz, California, appraised at $7,500,-000 on the basis of projected annual earnings of $895,000. This appraisal seems on the high side, but within a reasonable range. The key, of course, is what capitalization rate is chosen, and there opinions differ. The precise valuation is not terribly crucial. It is the best income property in the debtor's portfolio. Its function in the proposed settlement is to provide a positive cash flow during the development of Hawaii Loa Ridge.

The Annex is a tract of land opposite the Dream Inn containing a motel, a trailer park, a tract of land with a deserted hospital on it, and an old house selected as a National Historic Site. The value of $2,000,000 assigned to this ill-assorted potpourri is, in my view, excessive. I am not taking it into account very seriously as an asset of the core company, although some income is derived from the property. It certainly ought to go with the Dream Inn, and very likely, in connection with the Inn something can be done with it to improve its value and productivity.

8. One need only remember that the debtor's mortgagor undoubtedly had an expert opinion that it could successfully develop Hawaii Loa Ridge.

In my opinion, the values assigned to Hawaii Loa Ridge and Dream Inn are fair and equitable. It is further my opinion that there is a reasonable likelihood that the core company with these assets, with the cash provided, and the division of liabilities and claims proposed in the compromise, would be a viable entity with a substantial potential for returning a profit.

## III. *Evaluation and Conclusion*

I have concluded that the various elements of the proposed compromise are fairly and equitably valued, but that is not the same as concluding that the compromise itself is fair and equitable. It is not perfect. I have made suggestions to the parties which I believe would improve it, but they have not been accepted. As previously noted, this proceeding is a salvage operation. One critical question, therefore, is, what are the alternatives? Counsel for the Chapter X Trustees prepared a schedule attached to their Memorandum In Response to Trial Memorandum of Debentureholders

Committee "B". It outlines the results of different "scenarios" for the resolution of all these problems. It should be noted that the scheduled results for the junior debt assume no participation by the shareholders. The exercise is nevertheless useful for purpose of comparison. The arithmetic involved in these alternate schedules has not been challenged, and I assume that it is correct and adopt it. This schedule is annexed hereto as Exhibit 1.

I am persuaded that the proposed compromise will provide the best results for the junior debt and the stockholders of any reasonably likely alternative. The only better result would be obtained by subordinating all the senior debt. I consider that to be wholly unrealistic on the basis of any evidence developed to this point.

On the basis of the foregoing, I am satisfied that the proposed compromise is fair and equitable. My formal approval thereof has already been entered, effective May 23, 1980.

### Exhibit 1

As of September 30, 1979,
Updated to 3/31/80(1)

000 Omitted

| Assets: | Banks | CMI | TOTAL |
|---|---|---|---|
| Cash 9/30/79 | $124,518 | | |
| Increase to 3/31/80 (net income only, exclusive of real estate transfers) | 10,532 | $8,000 | $143,050 |
| Miscellaneous | 11,445 (4) | 729 (3) | 14,094 |
| Real Estate, Loans | 317,846 | 42,400 (6) | 360,246 |
| Note receivable, CMI not including 400,000 which is included in real estate number | (2,000)(2) | | |
| | 464,341 (2) | 51,129 | 517,390(2) |
| **Liabilities:** | | | |
| Accounts payable and accrued expenses | 10,309 (5) | | 12,273 |
| Counsel fees & expenses | 2,000 | | 2,000 |
| Litigation related to transfer assets | 2,000 | | 2,000 |
| Contribution to non-asset litigation | 839 | | 839 |
| Note Payable, Bank | | 2,400 | 2,400 |
| Subordinated debt | | 47,422 | 47,422 |
| Proofs of claim, including non-asset litigation | | 2,052 | 2,052 |
| Obligations assumed under Settlement | | 2,000 | 2,000 |
| | 15,148 | 53,874 | 70,986 |
| Net Assets | $449,193 | ($2,306) | $446,404 |

(1) Data as of September 30, 1979, updated to March 31, 1980 with respect to valuation of real estate assets and additions to cash from operating income.

(2) Total does not double count $2,000 in CMI cash, also N/R in bank column. Figures are subject to closing adjustments.

(3) 12/31/79 total of 1,025, less 296 included in real estate appraisals of Hawaii Loa Ridge, Dream Inn.

(4) 12/31/79

(5) 12/31/79 total of 13,409, less deferred income of 3,100. Deferred income would not be a cash charge.

(6) Assumes Dream Inn value of 9,400 and Hawaii Loa Ridge value of 33,000.

1. Calculation of net retained assets

| | | |
|---|---:|---:|
| Cash | $8,000 | |
| Real Estate | 42,400 | |
| Miscellaneous | 729 | |
| | 51,129 | $51,129 |
| | | |
| Note Payable | 2,400 | |
| Accounts Payable | 2,000 | |
| Claims, litigation | 2,052 | |
| | 6,452 | (6,452) |
| | | $44,677 |

2. Calculations of net transfer assets

| | | |
|---|---:|---:|
| Cash | $135,050 | |
| Real estate, loans | 317,846 | |
| Miscellaneous | 11,445 | |
| Note receivable, CMI | 2,400 | |
| | 466,741 | $466,741 |
| | | |
| Accounts payable | 10,309 | |
| Counsel | 2,000 | |
| Litigation | 2,000 | |
| Contribution to non-asset litigation | 839 | |
| | 15,148 | 15,148 |
| | | $451,593 |

3. Calculation of Total Net Assets — Retained $ 44,677
 Transfer 451,593
 $496,270

Calculation of several possible distribution scenarios:

While senior creditors might be entitled to add to the amount of their claims the amount of contractually subordinated claims, pursuant to the subordination contract, calculations on that basis, which would weight the distribution in favor of senior claims, have not been presented.

These following calculations also assume the payment of claims, including the portion of non-asset litigation to be funded from transfer assets in the event of settlement, of $2,891 prior to distribution to other creditors.

An adjustment would be necessary for any shareholder participation in the distributions considered below. A sample calculation has been done under the "Settlement Scenario".

4. Assume No Subordination

| | | |
|---|---:|---|
| Net assets | $496,270 | |
| Senior Debt | 559,607 | |
| | $(63,337) | |
| | | |
| % of distribution: | | |
| Senior | $496,270 | ÷ 559,607 = 88.7% |
| Others | | = 0% |

5. Assume Eurodollar Subordination

| | |
|---|---|
| Senior Debt | $559,607 |
| Eurodollar portion | (83,815) |
| | $475,792 |
| Net Assets | $496,270 |
| Unsubordinated Senior Debt | (475,792) |
| | $ 20,478 |

% of distribution:

Sub-debt $20,478 ÷ 47,422 = 43.2%

6. Assume subordination of all senior debt to subordinated debt

| | |
|---|---|
| Net Assets | $496,270 |
| Sub-Debt | (47,422) |
| Available for Senior debt | $448,848 |

% of distribution:

| | |
|---|---|
| Sub-debt | 100% |
| Senior debt | 448,848 ÷ 559,607 = 80.2% |

7. Assume all debt at same level of priority

| | |
|---|---|
| Senior Debt | $559,607 |
| Sub-Debt | 47,422 |
| | $607,029 |
| Net Assets | $496,270 |

$496,270 ÷ 607,029 = 81.8%

8. Settlement

 a. Senior Debt:

 | | |
 |---|---|
 | Net transfer assets | $451,593 |
 | Senior debt | 559,607 |

 $451,593 ÷ 559,607 = 80.7%

 b. Sub-debt (assume no shareholder participation):

 | | |
 |---|---|
 | Net retained assets | $44,677 |
 | Sub-debt | 47,422 |

 $44,677 ÷ 47,422 = 94.2%

 c. Sub-debt, assuming participation of shareholders to extent of 25% of net retained assets:

 .75 x $44,677 = 33,508

 $33,508 ÷ 47,422 = 70.7%

 d. Sub-debt, assuming real estate values suggested by Committee B (no shareholder participation):

 | | |
 |---|---|
 | Hawaii Loa Ridge | $20,500 |
 | Dream Inn and Annex | 6,150* |
 | Committee B Value | 26,650 |
 | Trustees Value | 42,400 |
 | Difference | $15,750 |
 | Net transfer assets | $44,677 |
 | Committee B reduction adjustment | 15,750 |
 | | $28,927 |

 $28,927 ÷ 47,422 = 61.0%

* Committee B's expert subtracted an amount of "management fee" from Dream Inn income before capitalizing the income to determine value. Since CMI earns the "management fee" itself, its inclusion in income is proper. Correction of this error would give Committee B a value of 6,450.

9. Fraudulent Transfer recovery:

 | | |
 |---|---|
 | Swapped assets: | $146,028 |
 | Debt reduction and cash ("DR") | 153,600 |

 a. No subordination

 | | |
 |---|---|
 | Net assets | $496,270 |
 | Swapped assets | 146,028 |
 | Gross assets | $642,298 |

| | |
|---|---|
| Senior debt | $559,607 |
| DR | 153,600 |
| | $713,207 |

$642,298 \div 713,207 = 90.1\%$

b. Eurodollar subordination

| | |
|---|---|
| Senior debt plus DR | $713,207 |
| Eurodollar portion | (83,815) |
| Unsubordinated Sr. debt | $629,392 |
| | |
| Gross assets | $642,298 |
| Unsubordinated Sr. debt | (629,392) |
| | $ 12,906 |

Sub-debt distribution, assuming no shareholder participation:

$12,906 \div 47,422 = 27.2\%$

c. Pari Passu:

| | |
|---|---|
| Senior debt plus DR | $713,207 |
| Sub-debt | 47,422 |
| Total debt | $760,629 |
| | |
| Gross assets | $642,298 |

$642,298 \div 760,629 = 84.4\%$

10. Summary of percentage calculations shown above, assuming no shareholder participation.

| | Senior | Sub-debt |
|---|---|---|
| a. No subordination | 88.7% | – 0 – |
| b. Eurodollar subordination | | |
| unsubordinated | 100% | 43.2% |
| Eurodollar | 0 | |
| c. Subordination of Senior to Sub-debt | 80.2% | 100% |
| d. All debt at same level | 81.8% | 81.8% |
| e. Settlement | 80.7% | 94.2% |
| f. Settlement, assuming Committee B values for retained assets | 80.7% | 61.0% |
| g. Settlement, assuming shareholder participation of 25% of retained assets | 80.7% | 70.7% |
| h. Void swaps, no subrogation | 90.1% | – 0 – |
| i. Void swaps, Eurodollar subordination | | |
| unsubordinated | 100% | 27.2% |
| Eurodollar | 0 | |
| j. Void swaps, all debts at same level | 84.4% | 84.4% |